[Civil No. 2141.   Filed December 22, 1923.]

[221 Pac. 213.]

# ABBIE I. PENDLETON, Appellant, v. MARY ELLEN BROWN, Appellee.

1. MARRIAGE — REMARRIAGE HELD NOT TO CREATE PRESUMPTION OF DIVORCE FROM FORMER HUSBAND. — Wife's remarriage did not create the presumption that she was divorced from husband two years prior thereto, when he acquired property claimed to constitute community property, since the presumption of divorce cannot extend beyond or antedate the circumstances upon which the presumption rests.

2. HUSBAND AND WIFE—STATUS OF PROPERTY AS SEPARATE OR COMMUNITY FIXED AT ACQUISITION.—The character of property as to being separate or community property becomes fixed at the time it is acquired, and if it is community property the wife's interest in it is vested at that time.

3. HUSBAND AND WIFE — ABANDONMENT AND ADULTERY PRECLUDES WIFE FROM CLAIMING INTEREST IN PROPERTY THEREAFTER ACQUIRED.—Wife who abandoned husband and lived in adultery with another man could not claim interest in property thereafter acquired by husband on theory that it is community property, under statute making adultery and abandonment, when judicially determined, work a forfeiture of subsequent marital rights.

4. HUSBAND AND WIFE—SEPARATION AGREEMENT HELD TO PRECLUDE WIFE FROM CLAIMING INTEREST IN PROPERTY THEREAFTER ACQUIRED.—Wife's agreement with husband to live separate and apart and to release husband from obligation to support her, in consideration of husband's conveyance of property to wife, *held* a relinquishment · of all right which wife might otherwise have in property thereafter acquired by husband, in view of wife's failure to claim interest therein until many years after property was acquired indicating her belief that under the contract she was not entitled to any interest therein.

5. COMMON LAW — ADOPTION OF COMMON LAW DOES NOT EXCLUDE APPLICATION OF SPANISH LAW.—Civil Code of 1913, paragraph 5555, adopting the common law, does not necessarily exclude the application of all principles of Spanish law, provided they are

---

2.   Effect of divorce upon community property in absence of adjudication, see note in 11 L. R. A. (N. S.) 103.

See 12 C. J., p. 188; 13 C. J., p. 546; 19 C. J., p. 178; 21 C. J., pp. 212, 226; 31 C. J., pp. 82, 176; 26 Cyc. 880; 31 Cyc. 388, 398.

applicable to customs and enactments adopted from that law and not inconsistent with the laws and customs of the state.

6. HUSBAND AND WIFE—RULE AS TO CONTROL OF COMMUNITY PROPERTY STATED.—The husband is the head of the community, and has power to manage and dispose of the community assets, and has exclusive control of the proceeds of the sale of community property, notwithstanding requirement that wife must join in conveyance of community real estate.

7. PLEADING—AMENDMENT DURING TRIAL DISCRETIONARY.—The right to amend pleadings in the course of a trial rests largely in the discretion of the court.

8. PLEADING—REFUSAL TO PERMIT AMENDMENT OF ANSWER DURING TRIAL HELD ERROR.—In widow's action to set aside deeds by deceased husband in which the evidence showed that the plaintiff was estopped from claiming any interest in the land by her abandonment of husband and adultery, the refusal to permit defendants to amend answer so as to include an allegation that the conveyances were made to defendants in consideration of the care and support of husband during the later years of his life, so as to make estoppel available to defendants as, purchasers for value, *held* error.

9. DIVORCE — IN WIFE'S ACTION TO SET ASIDE DEEDS BY HUSBAND, GRANTEES COULD ASSERT WIFE'S ADULTERY AND ABANDONMENT.— Where wife abandoned husband and lived in adultery with another man, and in divorce action, of which husband had no notice, did not litigate the question of her interest in property acquired by her husband after her abandonment, husband's grantees could defend her action to set aside deeds on ground that property was community property and she did not join therein, on the ground that because of wife's abandonment and adultery the husband had a right to make the conveyances and the property was not community property.

10. CONTRACTS — CONSTRUCTION BY PARTIES ADOPTED BY COURT. — Courts will adopt a construction given to a contract by the parties themselves, unless such construction does violence to the express terms of the writing, especially where such interpretation has extended over a long period of time.

11. ACTION—COURTS DO NOT FAVOR STALE DEMANDS.—Courts do not favor stale demands, especially when they are obviously postponed until the victim has become presumably defenseless through loss of evidence.

12. HUSBAND AND WIFE—DELAY HELD TO BAR WIFE'S SUIT FOR INTEREST IN HUSBAND'S PROPERTY AS AGAINST GRANTEES.—Wife's failure to assert claim to property in divorce suit and her delay for twenty years thereafter before commencement of suit against husband's grantees *held* to preclude her from claiming interest therein in such suit.

APPEAL from a judgment of the Superior Court of the County of Santa Cruz. Samuel L. Pattee, Judge. Reversed.

Mr. Frank J. Barry and Mr. Warren Lee Kinder, for Appellant.

Mr. Leslie C. Hardy and Mr. Duane Bird, for Appellee.

LYMAN, J.—The plaintiff in this action, appellee here, describing herself as Mary Ellen Brown, seeks to set aside two deeds made by one Thomas F. Brown in his lifetime, conveying property situated in Nogales, Arizona, to his daughter, Abbie I. Pendleton, one of the defendants in the action, and for an accounting of rents and profits received by defendant from said lands. The plaintiff bases her action upon the claim that she is the surviving widow of Thomas F. Brown, who died intestate, and that the lands in question are the community estate of herself and Brown, and that she did not join in executing the deeds of conveyance.

It may be admitted, though not beyond dispute, that Thomas F. Brown and the plaintiff intermarried in the state of Michigan in 1875. In 1878 they removed to the state of Texas, where they separated, the plaintiff deserting her home and taking with her their infant daughter and $800 in cash, the property of Brown, and going to Arizona, where without divorce she lived with another man as his wife in the town of Tombstone. Soon afterward Brown also removed to Arizona, and for a time they both resided at Tombstone, or in that vicinity. Brown seems to have there sought a reconciliation with plaintiff, but later finding that she was living in adultery, the separation between them became definite and permanent, followed by a property settlement and an

agreement of separation in the year 1880. Following this agreement, the plaintiff removed to the state of Michigan, and never afterwards returned to Arizona. Brown continued to live in Arizona for a "great many years," and in 1900 resided at Nogales, where in that year he acquired by purchase the land in question, holding title to it until November, 1917, when he conveyed it as above stated. The conveyance was in form a deed of gift.

About ten years after their separation, Brown heard that plaintiff, in company with a man named Archibel, had been killed in a railway accident, and afterwards, acting upon the belief that such report was true, again married. Of such marriage there was born one son, still living. In 1915 Brown, then living in Oakland, California, heard directly for the first time since 1880 from the plaintiff, who then bore the name of Harris. In 1917 plaintiff, then claiming to be the wife of Brown, brought suit against him for separate maintenance. This action was dismissed. In 1918 she sued him for a divorce. An application for suit money in connection with that cause was denied and the cause lay dormant until the death of Brown in 1920 in Oakland, California. All these proceedings were in the courts of California. This cause was begun in 1921.

The evidence in this case established beyond cavil that the plaintiff is not the surviving widow of Brown; but that in 1902, in the state of Michigan, then claiming to be a widow and under the name of May Archibel, she intermarried with one Norman Harris, who died in 1911. The plaintiff throughout prolonged and persistent cross-examination refused to disclose the significance of the name Archibel, how long she had borne it, or when she attained the status of widow before her marriage with Harris, and denied her marriage to Harris, but consistent with the allegations of her complaint persisted in the assump-

tion that she was the surviving widow of Brown, and therefore that all property acquired by Brown by purchase subsequent to their marriage in 1875 became their community property and subject to her claim as a wife during his lifetime, and as surviving widow upon his death.

During the long period of time from 1880, when she separated from Brown and left Arizona, until 1902, when she married Harris, plaintiff offers the most meager and reluctant account of her life and her whereabouts. When asked on cross-examination if she were not living at one time with a man named Archibel, the name under which she married Harris, she answered, "Hunt the records of the United States and see if you can find it." She denied having borne the name of Archibel. In further description of her life during that period she said, "I was back and forth and all around." She seems to have lived in many states during that period, including Michigan, Colorado, the territory of New Mexico, and others; but does not claim to have ever returned to Arizona.

The dissolution of the marriage relation between plaintiff and Brown appears only from the presumption which arises from her marriage to Harris in 1902, and from her claim made previous to that time that she was a widow having the name of Archibel. There is no direct evidence of a divorce. The presumption of divorce cannot extend beyond or antedate the circumstances upon which that presumption rests. All these circumstances appear to have occurred in 1902. Since she was a widow at that time, it must be supposed that a considerable period of time was required in which she procured a divorce from Brown and became the wife and afterwards the widow of Archibel; but we have no right to conclude that she became divorced or that she became the wife of Archibel as early as 1900, the date when Brown acquired the property in question. We have

no means of knowing nor ground for presumption that there was a legal separation between the plaintiff and Brown prior to that date. We must therefore conclude that the marriage relation still existed when Brown acquired the land claimed by plaintiff.

Resting upon that fact, the trial court decided that the land became impressed with the character of community property to which plaintiff might legally assert a claim, notwithstanding the property settlement and agreement of separation between the two, the adultery and abandonment of plaintiff, her prolonged residence and divorce in a foreign jurisdiction, her remarriage and her tardy assertion of her claims.

This action is based upon the proposition that while the marital relation remains undissolved, all property acquired by the husband during such relationship is community property, to which the wife is entitled in such proportion as the statute gives to her, unaffected by either her conduct or her contract, and that a deed to such property in which she does not join is invalid to bar her interest. Property acquired by Brown before the abandonment of the plaintiff and the agreement of separation is not involved. The questions raised here are: Was the property acquired by Brown twenty years after the abandonment of the wife and the agreement of separation and division of property impressed with the character of community property? And was the husband without authority, under the circumstances then existing, to alone convey such property? The character of the property, as to being separate or community, becomes fixed at the time it is acquired, and if it be community property, the wife's interest in it is vested at that time. It is our view of the law in the premises that the wife by her conduct had barred herself from any claim to this property, and that by her contract and the division and partition of the community estate between herself and Brown she

25 Ariz.—39

had relinquished all right which she might otherwise have had in all property thereafter acquired by Brown.

The appellants urge that the circumstances of this case are governed by the rule of the Spanish law, the immediate source of our community property regulation. By that law, at one time at least, the adultery and abandonment of the wife worked a complete forfeiture of all her community property rights, including accumulations already made as well as all subsequent gains made by the abandoned husband. This rigorous rule has long since been changed in the jurisdiction of its origin.

Much argument and citation are indulged in by counsel on both sides upon the question as to whether or not the principles of the common or the Spanish law should interpret the community property statutes. The terms in which the legislature has adopted the common law do not necessarily exclude the application of all principles of the Spanish law, provided they are applicable to customs or enactments adopted from that law, and which are not inconsistent with the laws and customs of this state (paragraph 5555 of the Civil Code); but the rule which appellants would have us adopt is inconsistent with both the laws and customs of this state. The statutes of this state make the adultery and abandonment of the wife, when judicially determined, work a forfeiture of all subsequent marital rights, including both status and property. It does not, however, impose as a penalty the loss of all property rights already gained. The exaction of the penalty which appellants urge upon us as authorized by the Spanish law is directly in conflict with the laws of this state, however it might be affected by the principles of the common law. Community property grows out of and depends upon the marriage relation. The regulation, therefore, of the marriage relation by statute, by common law, and

by decision of court, necessarily and inevitably, in-
directly at least, regulates community property rights.
The marital institution in this jurisdiction is quite
a different institution in some respects from the
marital relation under the Spanish law.  The prem-
ises upon which the Spanish courts reached their
decisions are not the same premises upon which the
courts of this state must decide community property
rights, and the determinations of those courts are,
therefore, not reliable precedents in a case of this
sort.  The institution of marriage and the conse-
quences following a violation of marital rights are
governed and controlled by the principles of the com-
mon law, the statutory law of this state, which has
been inspired by those principles, and judicial inter-
pretation of those laws.

The evidence leaves no question as to plaintiff's
adultery and abandonment.  So far as it was possible
for her to do so, she renounced and repudiated her
marriage relation with Brown in 1880, and never
afterwards indicated any change of purpose.  She
immediately removed to a foreign jurisdiction; Brown
remained and continued for many years to reside in
the same general locality of the place of separation.
Plaintiff says in her testimony that Brown was "al-
ways too glad to get me back."  The agreement of
separation and the circumstances under which it was
made have a bearing upon this question, as well as
defining property rights with which that agreement
deals.  When Brown had discovered his wife in co-
habitation with another man, he said to her, "Well,
I am through with you.  This is where we split
blankets," to which the plaintiff answered, "Oh, no;
what about the property in Michigan?  I want my
part of that."  To which Brown responded, "Well,
we will have an agreement."  Thereupon such an
agreement was prepared in writing and signed by
the two.  This writing was not in evidence, and its

loss will be hereafter referred to. Brown says of the agreement:

"We agreed to live separate and apart, and I should never support her any more or pay any of her bills; that she was never to molest me or to come where I was."

Whatever view may be taken of the effect of this writing to dispose of property rights, there is no uncertainty whatever as to the intention of the parties who signed the writing with reference to subsequent cohabitation. Following this agreement, plaintiff left the territory of Arizona, pursued her own way in life, dissolved at some time or other the marital relation between herself and Brown, and subsequently contracted two marriages before she returns to reap the fruits of Brown's labors forty years later.

The equal division of gains arising during the marriage relation is manifestly based upon contribution of some sort or other to the marital community, out of which those gains arise. The language of the courts and law-writers upon the subject is that the labors contributed by each are presumed to be equal, not of like sort, but of such sort as the several members of the community, depending upon their station in life, circumstances, and surroundings are wont and expected to contribute to the profit and welfare of the marital community and the integrity of the home. Whatever other functions the wife performs, she is withal the companion of her husband and the mother of his children.

It would be humiliating to the wife and belittling to the dignity of her position to assume that her abandonment of the home is not such a wrong to the marital community as affects her property rights, and that following the abandonment she is entitled to receive, equally with the wife who has remained faithful to her marital obligations, her full share unaf-

fected and undiminished of all the gains made by the husband during such period of abandonment. *Randall* v. *Randall*, 37 Mich. 563.

That the law of Spain regarded the wife as necessarily a present and active factor in the community is shown by the fact that when some other than the lawful wife stood in her place in the household, she was designated as the putative wife, and as such was entitled to the wife's share of community property.

While the common law did not divest the wife of her dower right because of misconduct on her part, the Statutes of Westminister 2, I Edward, 13, enacted in the thirteenth century, provided that adultery, accompanied by elopement and uncondoned by the husband, operated to bar the right of dower. The rule of that statute has been either accepted as a part of the common law or enacted into statute in probably every state of the Union which retains the right of dower.

The state of Texas, before adopting for every purpose the common law, gave effect to the early Spanish law. The case of *Wheat* v. *Owens*, 15 Tex. 241, 65 Am. Dec. 164, held that the abandonment and adultery of the wife forfeited her right to community gains. Subsequently after the adoption of the common law by Texas, *Routh* v. *Routh*, 57 Tex. 589, held that as to community property already accumulated, the divorce and adultery of the wife did not affect her interest, leaving the question as to its effect upon subsequently acquired property unsettled. In numerous cases the courts of Texas since that time, as well as before, have held that the abandonment of the wife forfeits her right to the homestead, and that after such abandonment the husband may alone convey the homestead; and the same rule obtains in many other jurisdictions both where the community system obtains and where the right of dower exists.

At the common law the abandonment by the husband and his residence in a foreign jurisdiction, or beyond seas, entitled the abandoned wife to maintain an action at law in her own name. In the United States the foreign jurisdiction is held to mean some other state of the Union. These instances show that the existence of the marital relation does not necessarily carry with it all property rights unaffected. The only controversy is to what extent and in what instances such property rights may be lost, divested or in some manner or degree affected. *Gregory* v. *Paul,* 15 Mass. 31; *Smith* v. *Silence,* 4 Iowa, 321, 66 Am. Dec. 137; *Sears* v. *Sears,* 45 Tex. 557; *Randall* v. *Randall,* 37 Mich. 563; *Abbot* v. *Bayley,* 6 Pick. (Mass.) 89; *Wright* v. *Hays,* 10 Tex. 130, 60 Am. Dec. 200; *Snipes* v. *Morton* (Tex. Civ. App.), 144 S. W. 286; *Starrett* v. *Wynn,* 17 Serg. & R. 130, 17 Am. Dec. 654; *Cullers* v. *James,* 66 Tex. 494, 1 S. W. 314; *Ayer* v. *Warren,* 47 Me. 217. Rights whether based upon contract, statute or Constitution may be abandoned and forfeited by the beneficiary. *Prater* v. *Prater,* 87 Tenn. 78, 10 Am. St. Rep. 623, 9 S. W. 361.

In the case of *Starrett* v. *Wynn,* 17 Serg. & R. 130, 17 Am. Dec. 654, the controversy was over the disposition by will of certain property by an abandoned wife. The opinion of the court is, in part, as follows:

"The testimony would have justified the jury in finding that Mary Starrett had been abandoned by her husband Samuel Gibson. The fact of abandonment as being found by the jury, raises a question of some novelty, as well as of great importance to *femes covert,* whether property acquired during the time of the desertion can be disposed of by the wife, by will or otherwise. In other words, is property acquired under such circumstances separate estate, and as such, subject to her disposition? It is conceded, that the control of the husband over the personal property of the wife, during coverture, is an important privilege, and well-established right, of which

he cannot be deprived, but by his own act or agreement. The acquisitions of the *feme covert,* inure to the benefit of the husband, as, when a bond is given to the wife, he may sue alone. A gift or legacy to the wife, and even the rewards of her personal labor, during coverture, vest in the husband, and he may release them. As the law imposes the obligation of maintaining the wife, and also endows her, it is but reasonable, that he should have the advantages which arise from the relation of marriage. But although these are conceded as general principles, yet the exigences of society, and experience, have introduced several exceptions. Thus, when a husband is exiled, his wife is permitted to sue in her own name. Co. Litt. 132, n. So also, when the husband has abjured the realm, in such case, she is permitted to claim her land, without her husband, and is exempted from the disabilities of coverture; she may maintain trespass, may sue for her jointure, and may also be sued as a *feme sole.* And, as in the case of the Countess of Rutland against Rodgers, she may make a will, and may, in all things, act as a *feme sole,* and as if her husband was dead, and this, from the necessity of the case. These cases, which are put by way of example, show the great relaxation which has taken place from the rigidity of the ancient rules, which are relaxed from necessity, or where the reason of the rule has ceased to exist. The question, then, arises, when the husband has abandoned his wife, separated from her, without affording her support, does his marital right still continue so as to give him an absolute property in her acquisitions? Unless some positive rule of law intervenes, policy and humanity would require, that, as he has cut himself loose from the duties, which the relation of marriage imposes, he shall not be allowed its advantages; his conduct would amount to a virtual surrender of his rights. Why should she not be permitted, by industry and management, to acquire property for herself and family? Why should she be liable to plunder, at the will and pleasure of a brutal and unfeeling husband, who perhaps, has deserted her without cause, and returns for the purpose of seizing on her hard earnings? A husband goes off with an adul-

tress, and continues absent for years; in the meantime, the wife, by industry, and the assistance and compassion of friends, acquires property, and she disposes of it by will, which the husband endeavors to wrest from the objects of her bounty. Such cases have, and will again arise, and it should be an unbending principle of law, which would sanction such injustice. It is said that she may obtain a divorce: but why should we compel a woman, deserted by her husband, to sue for a divorce? Although abandoned, they do not always cease to cherish an affection for a worthless husband; besides, some wives are principled against divorces, nor should they be compelled, in order to avoid injustice, to resort to such a remedy. They are sometimes stimulated to exertion by a hope that the acquisition of property may be a means of reclaiming the husband, or, at least, in case of a subsequent union, of preventing ill treatment."

We have, then, the well-recognized rule, which the courts of all jurisdictions have followed, that the rights of the husband and wife are affected by the misconduct of one or the other, and that the remedy for such wrong is not limited to an action of divorce, nor even to any proceeding in court, but that the courts will, when justice requires it, take cognizance of the wrong and correct the evil, and that the injured party may act upon the assumption that courts will do so. No instance has been cited, and it is safe to say that none exists, where the wife who wrongfully renounces and repudiates the marital relation is adjudged entitled to the subsequent gains of the husband. By such repudiation the community is at an end so far as property subsequently accumulated is concerned.

The argument of this cause has assumed that the right of the husband to convey, as well as his right to use the proceeds of the conveyance as his separate property, free and clear of any claim to it on the part of the plaintiff, are identical questions; but there is a distinction between the power of the hus-

band to manage, use and alien community property and the right to dispose of the proceeds in such a manner as to destroy any right which the wife might have in them. The undoubted purpose of the statute is to make the husband head of the community, and to invest him with the power to manage and to dispose of the community assets. Conveyance of real estate requires the signature of the wife, but the proceeds acquired from the sale of such property effected by means of the wife's signature is subject to the sole and exclusive control of the husband. Restriction upon the husband's power to convey title without the signature of the wife, like all other regulations affecting community property, is based upon the assumption that both husband and wife are fulfilling the duties and obligations imposed by law and incident to the relationship of husband and wife. It is not contemplated that if either one wholly fails to perform those duties, and renounces all obligation and responsibility in connection with the marital relation, that the innocent spouse must sit idle and helpless to the end of life. Nor is it contemplated that in order to carry on the normal business transactions of life, that the innocent spouse shall be forced to hasten to the divorce courts. It is the policy of the law to discourage rather than to compel divorce. The duty to accumulate carries with it necessarily the right to dispose of such accumulation. Restraint upon exchange and conveyance is a restraint upon accumulation. One of the duties of the courts is to afford relief for such wrongs, and to apply and adjust the statute law to human needs and the variability of human actions and conditions.

The effect of such a rule of restraint upon the exchange and transfer of property by the husband would be to render the husband incapable of performing those other obligations which the laws of both God and man have cast upon him, the care and

support of his children. The unoffending child is certainly none the less favored by the community property law than the offending spouse. The abandonment of the wife does not relieve the father of the support of his children. The obligation of the father to support the child continues unaffected by any act or agreement on the part of either of the parents. It must therefore follow that no conduct of either one or agreement between the two parents can take from the father the right and duty of accumulation and thrift, unhampered and unrestrained, that he may be able most efficaciously to meet those obligations to his children, the innocent members of the marital community. *Snipes* v. *Morton* (Tex. Civ. App.), 144 S. W. 286.

In the case of *Garrozi* v. *Dastas,* 204 U. S. 64, 51 L. Ed. 369, 27 Sup. Ct. Rep. 224 (see, also, Rose's U. S. Notes), Chief Justice WHITE discusses the law of community property and says:

"For, however derived, the very foundation of the community and its efficacious existence depend on the power of the husband, during the marriage, over the community, and his right, in the absence of . . . express legislative restriction, to deal with the community and its assets as the owner thereof. The purpose of the community, as expounded from the earliest times, whilst securing to the wife on the dissolution of the marriage an equal portion of the net results of the common industry, common economy and common sacrifice, was yet, as a matter of necessity, during the existence of the community, not to render the community inept and valueless to both parties by weakening the marital power of the husband as to his expenditures and contracts, so as to cause him to be a mere limited and consequently inefficient agent."

The statute directs that the "husband and wife must join in all deeds and mortgages affecting real estate, except unpatented mining claims," but that

"either husband or wife may convey or mortgage separate property without the other joining in such conveyance or mortgage." Such provision makes it the duty of the wife, except in instances of fraud and improvidence possibly on the part of the husband, actual or contemplated, to join with him in the conveyance of real estate; but it would be an unwarranted construction to place upon this provision to assume that when the wife by her own wrong has placed herself where it is impossible for her to join or to even consider the propriety of joining, therefore taking advantage of her own wrong she is able to render fruitless the labors of the innocent husband.

Texas by Constitution and statute has provided that the homestead shall not be conveyed without the consent and signature of the wife; but Texas courts, following precedents of other states, have held that when the wife repudiates and abandons the home and family, the husband may convey the homestead alone. One who renounces a status loses with it the benefits which are incident to that status, and courts will not award the benefits to one who had repudiated the thing out of which such benefits arise. Community property is conditioned upon the marital relation. One who repudiates and abandons the marital relation, repudiates and abandons the rights which grow out of and are conditioned upon such relation. Such a one cannot claim judicial relief from the consequences of her own wrong.

The deeds which plaintiff asks to have set aside are in form deeds of gift. In the course of the trial defendants moved for leave to so amend their answer as to include in it an allegation that the conveyances were made in consideration of care and support of Brown during the later years of his life. This motion was denied, and evidence offered to establish the allegation was excluded. The right to amend pleadings in the course of a trial must, of course,

rest largely in the discretion of the court; but a matter so vital to the issues should upon terms be admitted at any time. By the proposed amendment defendant Pendleton was alleged to have been a purchaser for value, and as such could have availed herself of the plea of estoppel (*McCord* v. *McCord,* 13 Ariz. 377, 114 Pac. 968), but which the court rightly held could not be made by one who paid nothing for the title.

Is the adultery and abandonment of the plaintiff available as a defense in this case to show not only the right of Brown to make the conveyance, but also to show that the property conveyed was not community property? Had Brown sought relief by means of an action of divorce with the evidence in this case upon these points, he would have been adjudged entitled to the land in dispute as a matter of course. Had plaintiff attempted to assert her claims to this property while it still stood in the name of Brown, as she might have done, unquestionably Brown would have been entitled to and could have successfully interposed as a defense to her claim her adultery and abandonment. Had the property question arisen in a divorce suit between Brown and the plaintiff, the disposition of the property would have been certain and simple. The plaintiff became divorced as early as 1902, with no adjudication of property rights between herself and Brown; so that any property which would otherwise, and previous to such divorce, have been community property, was left to the two former spouses as tenants in common. The failure to litigate the property question in the divorce suit was the fault of the plaintiff for which Brown was in no way responsible. The divorce action was in a foreign jurisdiction, and without notice to Brown. He could not have appeared had he desired to do so. Manifestly the plaintiff could not rightly acquire any advantage in bringing her

action in this manner. The law does not set a premium upon actions so commenced and carried on. The utmost that plaintiff was entitled to following her divorce was an adjudication in a separate action of such rights as she might have in the community property, involving a determination of what was and what was not community property. In such an action, whether commenced by herself or by Brown, Brown would, of course, have been entitled to raise any question affecting his right to the property which he could have raised in the divorce action. Such rights as Brown had he undoubtedly could convey, and the grantee would acquire the same rights, subject to the same equities and defenses, as affected the property while in the name of Brown. The defendant Pendleton is therefore entitled to show the abandonment and the adultery of the plaintiff with the same force and effect as Brown could have done. *Bedal* v. *Sake,* 10 Idaho, 270, 66 L. R. A. 60, 77 Pac. 638.

Aside from the light which the written agreement throws upon the separation, there remains to be considered its direct contractual effect. Did it, together with the conveyance to the plaintiff of the land in question, and her acceptance of such conveyance, operate as a relinquishment of all claims which she might otherwise have had in future gains of the husband? Neither the original writing nor a copy of it was introduced in evidence. Some form of this writing, original or otherwise, at one time in the possession of Brown, was destroyed by fire. Another form of the contract was in the possession of the plaintiff as late as 1916. Demand was made upon the plaintiff to produce this writing that it might be offered in evidence. To this demand plaintiff answered that there was no such writing, and never had been.

The trial court found, upon what appears to be incontestable evidence, that the writing was made, and that the testimony of the plaintiff was so completely impeached that her evidence was of no value. The presumption therefore arises that at the time of the trial, when demand was made upon her for the writing, it was then in her possession. A presumption also exists under such circumstances that evidence so withheld would, if produced, be adverse to the party withholding it.

The defendant, Pendleton, was then permitted to testify that at a hearing in 1918, in the superior court of San Francisco, California, upon an application by plaintiff for suit money in her action for divorce against Brown, Brown testified that the form of the agreement of separation which he once had was destroyed by fire, and that the agreement, referring to the plaintiff and Brown, recited, "We agreed to live separate and apart, and I should never support her any more or pay any of her bills; that she was never to molest me or come where I was"; and that coincident with the execution of this agreement, Brown conveyed to plaintiff his farm in Michigan. It is impossible to gather from the testimony whether anything was left to Brown after parting with his property; nor is there any evidence concerning his property until he acquired the land in question twenty years later; nor is there any evidence that subsequent to that time he owned anything besides this land; nor does it appear whether the agreement of separation contemplated that the plaintiff should support the infant daughter of herself and Brown which she took with her; nor is there any evidence concerning the disposition of the child, so that it does not in any way affect the questions involved. The evidence discloses that the plaintiff received from Brown all that she asked for, and there is no intimation that the settlement was not fair as be-

tween the two, and free from any imposition or fraud; nor is there any question of law raised as to the competency of the plaintiff under the circumstances to directly contract concerning any interest which she might then have or at any time in the future become entitled to as the wife of Brown. We are also entitled to consider the circumstance that after the introduction of this evidence of the contents of this agreement, plaintiff continued her refusal to produce the writing itself, and we may therefore assume that the writing, if produced, would have been more inimical to her interest than the oral version offered by the defendant.

By this agreement plaintiff covenants that she will never molest Brown or come where he was. She places an impassable barrier between herself and Brown which makes communication impossible, and the consideration of property agreements out of the question. If plaintiff ever had any interest in this property, it became fixed as a tenancy in common with Brown at the time of her divorce in 1902, or earlier. This property was gained by Brown after the separation, and during the time when she had agreed to leave him unmolested and make no pecuniary demand upon him. She could not have taken this property from Brown then without violating this agreement. She has no greater claim upon it now than she had then. *Rains* v. *Wheeler*, 76 Tex. 390, 13 S. W. 324; *Batla* v. *Batla* (Tex. Civ. App.), 51 S. W. 664; *Corrigan* v. *Goss* (Tex. Civ. App.), 160 S. W. 652. In the last case the opinion contains a statement of findings of fact made by the trial court. Those findings, so far as they relate to a contract of separation, were, first, a complete and definite separation; followed, second, by an agreement to permanently separate and divide their property; third, that the division of the property made "was equal and fair" and that the wife received and held that portion of it as-

signed to her; fourth, "that by the *partition* and *division* made between the husband and wife it was intended that such estate as the wife should thereafter acquire should be her separate estate, and that such estate as the husband should thereafter acquire should be his separate estate." It will be noted that the basis of the court's finding that subsequently acquired property should belong to the parties who severally acquired it is upon the fact of the partition and division made between them. The express terms of the agreement are nowhere recited in the opinion. The conclusion of the court that each party to the agreement was entitled to subsequent accumulations seems to be based, not upon the explicit statement in the writing that such should be the result, but upon the fact found that there had been a division of all the property accumulated up to that time, and that because such division was complete, just, and equitable, and the separation permanent and continued, it logically and legally followed that all property subsequently acquired should belong to the one who acquired it. It is difficult to see how a different conclusion could be arrived at. The portion which each party to the agreement takes becomes the basis and nucleus of subsequent accumulations. If at some time in the future either party could be entitled to have conveyances of the other set aside, and an accounting made of gains and accumulations acquired by him subsequently, the division of the property would be useless and ineffective.

The parallel between the facts of that case and the one at bar is not hard to trace. The portion of the property assigned to the plaintiff was all that she asked for; it was fair and equitable so far at least as she was concerned. If it was not all that the two parties then had, there is at least no reliable evidence to the contrary. The undisputed facts clearly indicate that the conveyance of the Michigan farm

to the plaintiff was made in furtherance of a division of Brown's property, and intended and accepted by both parties to the transaction as a final and complete settlement of all property rights between them.

It is elementary that courts will adopt a construction given to a contract by the parties themselves, unless such construction does violence to the express terms of the writing. This rule is especially applicable where such interpretation has extended over a long period of time. It is certain from the evidence that as early as 1902 plaintiff had recourse to the courts to settle her marital difficulties with Brown, out of which there is presumed to have proceeded a decree of divorce, but with no adjudication of property rights. This litigation was in some jurisdiction foreign to the residence of Brown. Brown was entitled to have all controversies between himself and the plaintiff, growing out of their marital relation, adjudicated in one action. We have a right to assume that the plaintiff did adjudicate all causes of action arising out of the marital relation which plaintiff conceived herself entitled to, and her failure to have any property rights litigated at that time indicates that she believed all such rights had been fully disposed of in the agreement of separation. The failure of the plaintiff to assert the claim which she now makes in the course of her action for divorce is fruitful of consequences in this lawsuit. There is not wanting authority to the effect that her failure to do so is an effectual bar to her assertion of the claim at this time.

In the case of *Bedal* v. *Sake,* 10 Idaho, 270, 66 L. R. A. 60, 77 Pac. 638, the facts were that the plaintiff left her husband in the state of Idaho and removed to Washington, where she obtained a decree of divorce and remarried. After a few years she returned to the state of Idaho, and sought to recover from her divorced husband community property ac-

25 Ariz.—40

quired by them during the time when they lived together as husband and wife. The majority opinion in that case reasons that the decree for divorce having been granted in a foreign jurisdiction, and no disposition of the community property made in that action, that the Idaho courts were without jurisdiction to dispose of the community property rights in a subsequent and separate action. A dissenting opinion, however, takes the position that a court of equity would have power to do justice between the parties, and if the wife was entitled to receive a portion of the property that she assisted in accumulating, she certainly ought to have it. The dissenting opinion appears to us should have been the law of that case; but that rule would be quite as disastrous to the plaintiff here as the law of the decision.

Plaintiff is making her claim upon her bald legal right to the property under the rule of the statute, unaffected by either her conduct or her contract, and directly in the face of every equitable consideration. The plaintiff seeks at the very threshold to impose a fraud upon the court by representing herself as the widow of Brown. Proceeding upon this false basis, she asks the court to give her property she did not help to accumulate, which was acquired by Brown; property by which Brown seeks to make provision for one of his children. It may well be doubted whether the jurisdiction of a court of equity should be successfully invoked in a case based upon fraud and supported largely by evidence which the trial court found to be perjured.

The defense in this cause was hampered and crippled by the lack of evidence, which had been obscured or totally lost during the long time which had elapsed before the commencement of this suit. Brown's copy of the agreement of separation had been destroyed. Brown himself, the chief witness, had died. After plaintiff discovered that Brown had lost his copy of

the agreement of separation, she made two unsuccessful attempts in California to possess herself of a portion of Brown's property; but the testimony of Brown stood in her way. But she bided her time, and after Brown died, she commenced this suit, at least twenty years after recovering a divorce from him, when, if ever, she should have asserted her claim upon this property. Courts do not favor stale demands. Such demands are especially obnoxious when they are obviously postponed until the victim has become presumably defenseless through the loss of evidence. The rule in such cases is stated in *Cunningham* v. *Costello*, 16 Ariz. 479, 147 Pac. 714:

"Where a suitor before proceeding permits such a lapse of time that the evidence has become obscured or lost, relief will be denied because of the difficulty of doing justice. . . . A specific application of the general rule just stated is in the refusal of the courts to afford relief to one who has lain idly by until the important witnesses to the transactions involved have died. Of course the result is the same where the testimony so lost is that of participants in the transaction, who would be parties to the suit had they lived; but where such parties die there are usually difficulties presented in procuring evidence and conducting the case, other than those arising from the loss of their own testimony, and relief is denied for that reason."

"A court of equity which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights and acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith and a reasonable diligence; where these are wanting, the court is passive and does nothing. Laches and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction there was always a limitation to suits in this court. *Smith* v. *Clay*, Amb. R. 645." *Cranmer* v. *McSwords*, 24 W. Va. 594; *Lutjen* v. *Lutjen*, 64 N. J. Eq. 773, 53 Atl. 625.

The conclusion arrived at is that defendant was entitled to judgment, because of the settlement of the property rights and agreement of separation between Brown and the plaintiff, and because plaintiff forfeited all right to the property in dispute by abandonment of Brown, and by laches in bringing this suit.

The cause is reversed and the superior court is directed to dismiss it.

McALISTER, C. J., and ROSS, J., concur.