449 P.2d 7

In the Matter of the ESTATE of
J. N. HARBER, Deceased.

Rex E. STALEY and E. J. O'Malley, as Co-Executors under the Last Will and Testament of J. N. Harber, Deceased, Appellant,

v.

The ESTATE of Mary H. HARBER,
Deceased, Appellee.

No. 8572.

Supreme Court of Arizona.
In Banc.
Jan. 2, 1969.

80

Charles A. Stanecker, Evans, Kitchel & Jenckes, Phoenix, for appellant.

Lewis, Roca, Scoville, Beauchamp & Linton, by Charles Crehore, Phoenix, Spurr & Steed, by J. Rex Spurr, Shawnee, Okl., for appellee.

FRANK X. GORDON, Superior Court Judge.

Dr. J. N. Harber, died a resident of Phoenix, Maricopa County, Arizona on August 8, 1962. He was survived by his widow, Mary H. Harber. Mrs. Harber died on March 6, 1963.

The last will and testament of J. N. Harber was admitted to probate on August 31, 1962 and Joe Lanser, Sr., Rex E. Staley and E. J. O'Malley qualified and were appointed as co-executors. Mr. Lanser died in December 1963 and Messrs. Staley and O'Malley have continued to function as the surviving co-executors. On the demise of Mrs. Harber, her will was admitted to probate and one Irene Foley was appointed and qualified as executrix.

Dr. and Mrs. Harber were married on or about July 4, 1906; and lived together as husband and wife until the death of Dr. Harber. There was no issue born as a result of this marriage and no child or children were ever legally adopted by them.

On June 11, 1938, in contemplation of a move from the State of Oklahoma to take up residence in the City of Phoenix, Arizona, Dr. and Mrs. Harber entered into the following agreement, to-wit:

STATE OF OKLAHOMA ⎫
COUNTY OF SEMINOLE ⎬ SS    Articles of Agreement
⎭

KNOW ALL MEN BY THESE PRESENTS:

WITNESSETH:—That, Whereas, J. N. Harber, hereinafter referred to as party of the first part, and Mary Harber, hereinafter referred to as party of the second part, are husband and wife:

And, whereas, the said parties have no direct heirs or living children to whom their property would descent; and Whereas, each party hereto has brothers and sisters and other blood relatives, which they desire to aid and assist.

And, Whereas the parties hereto have mutually agreed while in health and strength, to divide their property, each releasing to the other his or her separate estate so that each party may deal with his or her separate estate as they desire.

It is, therefore, agreed that the party of the second part for and in consideration of the sum of One Hundred Thousand ($100,000.00) Dollars, cash in hand paid by the said first party, the receipt of which is hereby acknowledged by the said second party, and in consideration of the property located in Maricopa County, Arizona, described as follows, to-wit:

Lots numbered Fifteen (15), Sixteen (16), Seventeen (17), Eighteen (18), Nineteen (19), and Twenty (20) in Block numbered Four (4), in EVANS' ADDITION TO ORANGEWOOD, according to the official map or plat thereof on file and of record in the office of the County Recorder of Maricopa County, in Book 2 of Maps, at page 56 thereof—

And in consideration of other good and valuable considerations does hereby surrender, release and waive all rights, claims and demands of whatsoever kind or nature that she may have at this time or that she may hereafter acquire in or to any of the property of the first party hereto, whether said property be real, personal or mixed.

For and in consideration of the covenants and agreements made and herein contained, the said second party specifically surrenders and waives any and all claims, rights of dower, support or alimony or any other claim or demand whatsoever kind or nature, which said second party may have at this time or which she may hereafter acquire in, to or against the property or property rights of the first party.

Said first party specifically waives and surrenders any and all claims of whatsoever kind or nature that he may now or that he may hereafter acquire in and to, or against the property or property rights of the said party of the second part.

Each of the parties hereto agrees that the property set over herein to the party of the second part, is to be and constitute her spearate property and is hereby accepted by her as her just and equitable division of all the properties owned at this time by the parties hereto, with full power and·authority on her part to sell, give away, dispose of by gift, conveyance or will, any and all of the said property to whomsoever she may, without the knowledge or consent on the part of the other party hereto.

It is understood and agreed that the homestead located in the City of Seminole, Oklahoma, and described as follows, to-wit:

All of Lot One (1) and the North Half (N½) of Lot Two (2), in Block Twenty-six (26), in Fairmount Addition to the City of Seminole, Seminole County, Oklahoma, according to the officially recorded plat thereof—

shall be retained by the parties hereto as their homestead and is hereby declared to be such and the same cannot be conveyed without the consent of both parties hereto, it being agreed that the survivor in case of death shall take all of said property together with all furniture and fixtures therein contained.

It is further understood and agreed that the remainder and residue of the property belonging to the parties hereto not above described shall be the property of the party of the first part and the party of the second part hereby disclaims any interest therein and grants, bargains, sells and conveys and assigns and sets over to the party of the first part, all of said property.

Each of the parties hereto agrees at the request of the other to sign any and all papers, to transfer any property, real or personal now owned and acquired by either of the parties hereto and parties specifically waive any right in or to the property of the other now owned or hereafter acquired by either of said parties.

It is mutually agreed between the parties hereto that this property settlement is fully understood and is being carried out so that the parties hereto may by will or otherwise transfer their separate property, so that at the time of death of either party hereto, whatever disposition either of the parties may have made of his or her separate property, the title to the same may vest in their grantees, beneficiaries or devisees, without any claim being made thereto by

the other party by reason of any inheritable right which each hereby specifically waives.

Signed this the 11th day of June, 1968.

/S/ J. N. HARBER
Party of the First Part

/S/ MARY HARBER
Party of the Second Part

(acknowledgment omitted)

The Last Will and Testament of J. N. Harber dated July 25, 1952, paragraph First thereof reads as follows:

"FIRST: I declare that I am married and that my wife's name is Mary Harber, and that we have no children. I further declare that my said wife and I have no community property, a property settlement agreement having been entered into between us on June 11, 1938. I declare that I have no interest in the real property and improvements located at 5751 North Central Avenue, title to which is in the name of Mary Harber, all of which is her separate property, and that she has no interest in the real and personal property, the title to which is in my name, all of which is my separate property."

The property described in the paragraph of the will above quoted, 5751 North Central Avenue, is the same property as is described as Lots 15, 16, 17, 18, 19, 20 in Block 4, Evans Addition to Orangewood, in the agreement of June 11, 1938.

At the time of execution of the 1938 agreement, the value of property in Mary Harber's name was approximately $296,000. This consisted of $45,000 cash, a $45,000 receivable arising from a loan to Claude Harber, Dr. Harber's nephew, and a $206,000 receivable arising from a loan to Dr. Harber. At the same time Dr. Harber had accumulated net assets in the approximate value of $800,000.

Mary Harber never received $100,000 cash, but instead a promissory note was prepared. There was no evidence that the promissory note was ever delivered to Mary and no one has been able to locate it. The Phoenix real property which went to Mary under the agreement was purchased for $43,000, toward which Mary had already contributed $25,000 from her own funds. Dr. Harber treated the agreement as washing out his $206,000 loan from Mary. Sometime later Mary Harber's entire bank account was transferred into the account of Dr. Harber. At this time, the account had increased from $45,000 to about $82,000 by virtue of Claude Harber having paid off his loan. The fact of this transfer was kept from Mary Harber. Although the agreement did not so provide, Dr. Harber later interpreted the contract as transferring to Mary the Oklahoma homestead worth approximately $4,500.

The net effect of the agreement as far as Dr. Harber was concerned was to leave Mary Harber with the 40 acres in Phoenix, the homestead in Oklahoma, and the $100,000 promissory note.

The 1938 agreement was drafted by Mr. Pryor, an Oklahoma attorney who also stated to Dr. Harber that he could not vouch for its validity. Dr. Harber expressed on more than one occasion, his philosophy about a woman's legitimate claim to care and support. His philosophy was that it was sufficient if a woman had $500 a month and a home in which to live. Dr. Harber also expressed a reluctance to leave any substantial sums of money to his wife which she could then leave to her relatives. His position was that relatives on the Hunter side of the family were not to benefit from what he considered to be his efforts.

On February 19, 1963, there was filed in the Superior Court, Maricopa County, Arizona, pursuant to Article 7, Chapter 5, Title 14 of the Arizona Revised Statutes, (A.R.S. Sec. 14–641 et seq.) on behalf of Mary Harber, a Petition for a Determination of Heirship, paragraph VII of said petition reads as follows:

"Your petitioner is the surviving spouse of J. N. Harber, deceased, and is informed and believes, and upon such information and belief alleges that the entire estate of J. N. Harber, deceased, is the community property of your petitioner

and the decedent, and she herewith petitions the Court to make and enter an order herein to such effect."

On March 7, 1963, the appellants, co-executors of the estate, filed a response to said Petition for a Determination of Heirship, and in such response, denied that the property was community but alleged that it was the separate property of J. N. Harber. On February 26, 1963 a second Petition for a Determination of Heirship was filed on behalf of Mrs. Harber, this petition claiming that Article Fifth of the last will and testament of Dr. Harber was invalid. The co-executors filed a response to the second Petition, denying the claim that Paragraph Fifth was invalid. Motions were filed to strike the response of the executors to said petitions and on the denial of the court, petitioners sought a Writ of Prohibition in this Court, being Cause No. 7949. The writ was denied. The matter was then at issue as respects both petitions.

By agreement between both counsel and the trial court, both petitions were to be heard at one time. It was agreed, that the petition respecting the validity of Article Fifth of the will presented only a question of law; that it would be submitted on briefs, and that the Court would permit oral argument at the time of trial on the issue involved in the first of said petitions.

On the date set for trial, the court heard oral argument on the second of the Petitions for a Determination of Heirship and made a ruling thereon. That ruling of the Court was the subject matter of an appeal to this Court in Cause No. 8420, which was decided Dec. 15, 1965. See 99 Ariz. 323, 409 P.2d 31.

On the same date, the petitioners presented argument on a "Motion for Partial Summary Judgment" which had been filed on January 22, 1964, seeking to strike an affirmative defense set forth in the response of the executors. The ruling of the court was as follows:

"The Court having heard oral argument and the Court finding that the Agreement of 1938 applies only to the property then held by the parties, it is ordered that the Motion for Partial Summary Judgment is granted in the following respects: The property of this estate is prima facie community property, and the only purpose to be served by the 1938 agreement is to fix a point of time at which the entire property of the parties to the agreement was divided into their respective estates. Property acquired after 1938—that is the date of the agreement—is separate only if purchased by separate funds, or acquired by gift, devise or descent."

Rather than proceeding to trial on the issues, because of the above ruling, it was the conclusion of the court that the burden of proof was now upon the executors to establish separate nature of the property rather than the burden of the petitioner to prove the allegation that the property was community. Therefore, proceedings took place in the nature of a "pre trial" at which hundreds of exhibits were introduced.

When trial commenced, all of the "pre trial" exhibits were re-introduced into evidence. The first witness was then called.

By the evidence introduced by the co-executors, appellants have traced approximately 175 different real estate transactions in which Dr. Harber was involved after their move to Arizona. With perhaps two or three exceptions, in each of these transactions, Mrs. Harber executed a quit claim deed, gift deed, warranty deed, or disclaimer deed in favor of Dr. Harber.

At the conclusion of their evidence the petitioner, representing the Estate of Mary Harber, moved for judgment on the grounds that the executors had failed to carry the burden of proof and that it was incumbent on the court to declare all of the property to be community. This request was taken under advisement. On April 23, 1964 the Court entered the following "Findings of Fact and Conclusions of Law and Judgment":

(Title of Action)

Filed April 23, 1964

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND JUDGMENT

Prior to trial in the above entitled cause, this Court ruled that all property shown on the inventory and appraisal of the estate of Dr. J. N. Harber was prima facie community property. This ruling shifted the burden of going forward with the evidence to the executors who challenged the community character of the property. The matter having since duly come on for hearing, and witnesses having testified, and numerous stipulations having been made, and exhibits having been submitted, and briefs and arguments having been presented, all of which have been fully considered, this Court enters the following findings of fact, conclusions of law and judgment.

### FINDINGS OF FACT

1. J. N. Harber and Mary Harber were married on or about the 4th day of July, 1906, and the marital relationship continued until the date of his death on August 8, 1962.

2. Mary Harber had implicit trust and confidence in Dr. J. N. Harber and in transactions between Dr. and Mary Harber, Dr. Harber stood in a fiduciary relationship to his wife.

3. On or about June 11, 1938, while residing in Oklahoma, Dr. and Mrs. Harber entered into a postnuptial agreement. The agreement was not executed by Dr. and Mary Harber incident to separation or divorce, nor were they contemplating separation or divorce.

4. At about the time the 1938 agreement was executed, Mary Harber had assets in her name in the approximate value of $300,000. Dr. Harber's net estate in 1938 was valued at about $800,000. The agreement provided that all property not otherwise described therein was to become the sole property of Dr. Harber. The only property specifically set aside to Mary Harber in the agreement was certain real property located in Maricopa County, Arizona, and $100,000. in cash. Mary Harber never received the $100,000. cash mentioned in the agreement, and the executors admit only the sum of $82,900. due and owing Mary Harber by virtue of checks written on her bank account by her in the amount of $17,100. subsequent to execution of the 1938 agreement. The purchase price of the Maricopa County property was $43,000. toward which Mary Harber had previously contributed from her own estate $25,000. Mary Harber was not represented by independent counsel in connection with the preparation and execution of the agreement and was not advised as to the extent of her property rights affected by it.

5. Dr. Harber's dominant purpose in obtaining execution of the 1938 postnuptial agreement was to prevent Mary Harber from accumulating an estate comparable in size to the Doctor's which she could leave to her relatives.

6. During the month of June, 1938, Dr. and Mrs. Harber moved to Phoenix, Arizona, where they continually resided thereafter.

7. All property, whether real, personal or mixed, listed, itemized or shown on the inventory and appraisal of the estate of Dr. J. N. Harber on file was purchased or otherwise acquired during the time J. N. Harber and Mary Harber were husband and wife and living together in the State of Arizona.

8. None of the property, either real, personal or mixed, listed, itemized or shown on the inventory and appraisal of the estate of Dr. J. N. Harber on file was acquired by J. N. Harber by gift, devise, or descent.

9. During Dr. Harber's residence in Arizona and while he was married to and living with Mary Harber his sole business occupation, which kept him fully occupied was the management, improvement, repair, renting, buying and selling real estate, plus additional incidental farming operations, consulting, and the trading of stocks and bonds.

10. All earnings from Dr. Harber's occupation went into a single bank account,

and all monies used to acquire properties came out of this same bank account.

11. There is no evidence of any specific separate property of Dr. Harber being used in the foregoing business activities.

12. There is no evidence which would help determine what portion of the proceeds of the sales of properties subsequent to June 11, 1938 was the result of appreciation of any specific separate property of Dr. Harber, and what portion of the proceeds was the result of the personal efforts of Dr. J. N. Harber.

13. In connection with Dr. Harber's voluminous real property dealings, Mary Harber executed various quit claims, warranty and disclaimer deeds. These deeds were executed by Mary Harber only for the purpose of facilitating the handling, sale, and transfer of property by Dr. Harber. The deeds were not intended by Mary Harber as gifts, and no consideration was paid to her for them.

## CONCLUSIONS OF LAW

1. All of the property in the estate of Dr. J. N. Harber is presumed to be community property, and the burden of proof was upon the executors to prove otherwise by clear and convincing evidence. This burden of proof was not carried.

2. The burden of proof was upon the executors to show the 1938 postnuptial agreement free from fraud, coercion, and undue influence, and that the transaction was fair and equitable. This burden of proof was not carried.

3. The 1938 postnuptial agreement did not prevent the acquisition of community property by Dr. and Mary Harber.

4. The estate of Mary Harber was a community interest in all property shown on the inventory, and appraisal of the estate of Dr. J. N. Harber.

## JUDGMENT

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the Petition for Determination of Heirship filed in the above entitled and numbered cause by Mary Helen Harber on the 19th day of February, 1963, be and the same is hereby granted.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all property itemized, listed or otherwise shown or set forth in the inventory and appraisal of the estate of J. N. Harber, deceased, subject to the jurisdiction of this Court, is hereby found, determined and declared to be the community property of J. N. Harber and Mary Helen Harber, his surviving spouse.

DONE IN OPEN COURT this 18th day of May, 1964.

It is from these findings and the judgment predicated thereon that this appeal has been taken.

The basic question presented for review, of course, is whether the property standing in the name of Dr. J. N. Harber at his death is separate or community. It was the judgment of the trial court that it is community despite the agreement entered into by the Harbers in Oklahoma in June, 1938, and despite the fact that it was apparently conformed to by Mrs. Harber for a period of 24 years thereafter. As late as Sept. 13, 1962, more than a month after Dr. Harber's death, Mrs. Harber wrote a will, admitted in evidence in this cause, in which she stated:

\*   \*   \*   \*   \*   \*

"THIRD: I further declare that all of my property is my separate property as my husband and I, on the 11th day of June, 1938, entered into an agreement wherein and whereby we agreed what was the property of my late husband and what was my property."

\*   \*   \*   \*   \*   \*

The agreement entered into between Dr. and Mrs. Harber on June 11, 1938 in Oklahoma was not made in contemplation of divorce or separation. They lived together apparently happily for 24 years thereafter.

Appellant contends that the agreement entered into in Oklahoma in 1938 should be upheld as valid in Arizona, and as having

the effect of dividing their property, with each waiving his or her right in after-acquired property in Arizona, causing such after-acquired property to have the character of separate property, rather than community. Also, appellant contends that the acts of Mrs. Harber in conforming to this agreement for a period of 24 years creates an estoppel against her estate and her heirs, devisees and legatees, or else this conduct constitutes a ratification of the terms of this agreement.

Appellee contends that the 1938 Oklahoma agreement should be declared void as a matter of law and policy; or if valid, the agreement did not contemplate after-acquired community property; or if valid, the agreement was voidable if not proved by the estate of Dr. Harber to have been free from fraud, undue influence, and to have been fair and equitable.

This Court has declared to be valid postnuptial agreements which are incident to separation or divorce. See Roden v. Roden, 29 Ariz. 398, 242 P. 337 (1926).

The validity of postnuptial agreements not related to separation or divorce and which attempt to prevent, prospectively, the acquisition of community property has never been expressly ruled upon by this Court. Antenuptial contracts are covered by Sec. 25–201, A.R.S., and are not involved in this case.

Sec. 25–214, A.R.S., defines the rights of married women in Arizona:

"A. Married women of the age of twenty-one years and upwards have the same legal rights and are subject to the same legal liabilities as men of the age of twenty-one years and upwards except the right to make contracts binding the common property of the husband and wife.

B. Married women have the sole and exclusive control of their separate property. The separate property of a married woman is not liable for debts or obligations of the husband, and it may be sold, mortgaged, conveyed or bequeathed by the woman who owns it as if she were not married."

In commenting on the freedom of women in Arizona from common law disabilities, our Court said in Hall v. Weatherford, 32 Ariz. 370, 259 P. 282, 56 A.L.R. 903 (1927):

"From the case Charauleau v. Woffenden, 1 Ariz. 243, 25 P. 652, to that of Schofield v. Gold, 26 Ariz. 296, 225 P. 71, 37 A.L.R. 275, our attitude has been that the wife was an independent human being, with the full power to decide and determine for herself all questions involving her rights, and the old presumption that though before marriage, and during widowhood, she was as fully capable of managing her affairs as a man under the same circumstances, while coverture existed she lost all independent volition, knowledge and capacity, and was to be treated as an infant under guardianship, so far as Arizona is concerned, is utterly obsolete. Since such is our theory of the marriage status, cases which are based either consciously or unconsciously on the old idea of the inferiority of the female sex and the subserviency of the wife to the husband are not in point * * *" 32 Ariz. at 378, 259 P. at 285.

In Schofield v. Gold, 26 Ariz. 296, 225 P. 71 (1924), this Court stated that the only thing a married woman could not do was to make contracts binding the common property of husband and wife. The Court said:

"Subject to the one exception stated, the wife's freedom of contract is so complete that it is not compared with that of one bound by marital ties, but with that of a man of competent age without such ties. With the one exception, it invests her with all the rights, and burdens her with all the responsibilities, which are incident to that status. Her contracts not in contravention of the exception are to be given the same force and effect as the contracts of an unmarried man, including the right to contract with whom-

soever she will, the husband included." 26 Ariz. at 299, 225 P. at 72.

In the Estate of Baldwin, 50 Ariz. 265, 71 P.2d 791 (1937), our Court said:

"Property acquired by both spouses during marriage likewise belongs to the community, but whether acquired by one or both, either may convey his interest to the other and thus dissolve the community. In Luhrs v. Hancock, 6 Ariz. 340, 57 P. 605; Main v. Main, 7 Ariz. 149, 60 P. 888; Colvin v. Fagg, 30 Ariz. 501, 249 P. 70; Jones v. Rigdon, 32 Ariz. 286, 257 P. 639, and other cases, it has been decided by this court that a husband may convey his interest in the community to his wife, and in Schofield v. Gold, 26 Ariz. 296, 225 P. 71, 37 A.L.R. 275, that a wife may convey hers to her husband. If the spouses may contract with each other concerning the interest of either in the community, there can be no reason why they may not agree between themselves that it may be conveyed to them in the first instance and held in joint tenancy." 50 Ariz. at 273, 71 P.2d at 795.

■ We feel that in view of the relatively equal status of women to men under the law, that married couples should not be deprived of the right by contract to divide their property as they please, both presently and prospectively, assuming the contract is voluntary, free from fraud and is fair and equitable.

California, a community property state, similar in its laws in many respects, has adopted this view. In the leading case of Perkins v. Sunset Tel. and Tel. Co., 155 Cal. 712, 103 P. 190 (1909) the Court after finding as a fact that an agreement existed for more than ten years between husband and wife whereby it was mutually consented that all of the community property on hand or to be acquired by either should be the separate property of the wife, held:

"Under our law there can be no doubt that a husband and wife may enter into a contract with respect to their property whereby one may release to the other all

interest, both present and in expectancy." 103 P. at 193.

Although that case dealt with the wife's right to recover damages for a personal injury, and the California case of Cheney v. City and County of San Francisco Employees Retirement System, 7 Cal.2d 565, 61 P.2d 754 (1936), which followed the Perkins rule, dealt with earnings of the spouse, we cannot see a valid reason not to apply the rule to after-acquired real property as well, as was done by the Court in the community property state of Washington in Union Securities Co. v. Smith, 93 Wash. 115, 160 P. 304 (1916), where the Court said:

"1. Both R. P. and Janette P. Smith testified that during all of their married life they have conducted their business separately; that at the time of the marriage she had a considerable amount of property inherited from her father; that at or about that time it was agreed between them that whatever she acquired should be hers, and upon her death should go to her children, and that whatever he acquired and his personal earnings should be his, and upon his death should go to his two children by a former marriage. Three disinterested witnesses who had known the Smiths for many years and had transacted business with both of them testified that they had always conducted their business separately. * * * This evidence fairly establishes the agreement and shows that in the main it had been continuously acted upon. Though this was an oral agreement, it does not appear that it was made before the marriage. It is not assailed as a contract made upon consideration of marriage, hence void because verbal, as we held in Koontz v. Koontz, 83 Wash. 180, 145 P. 201. The statute of frauds is neither pleaded nor discussed. Such agreements made after marriage and mutually observed are valid. Gage v. Gage, 78 Wash. 262, 138 P. 886; Dobbins v. Dexter Horton & Co., 62 Wash. 423, 113 P. 1088; Yake v. Pugh, 13 Wash. 78, 42 P. 528, 52 Am.St.Rep. 17." 160 P. at 305.

■ We adopt the proposition that marital partners may in Arizona validly divide their property presently and prospectively by a post-nuptial agreement, even without its being incident to a contemplated separation or divorce. We also feel that this rule should include the built-in safeguards that the agreement must be free from any taint of fraud, coercion or undue influence; that the wife acted with full knowledge of the property involved and her rights therein, and that the settlement was fair and equitable. Such is the rule which prevails in New Mexico, as set forth in Sande v. Sande, 83 Idaho 233, 360 P.2d 998 (1961) followed as recently as June 3, 1968, in the New Mexico Case of Trujillo v. Padilla, 79 N.M. 245, 442 P.2d 203 (1968).

In the *Sande* case, following precedent set down in Beals v. Ares, 25 N.M. 459, 185 P. 780 (1919), the court said:

"Where a post-nuptial property settlement is attacked by the wife on the ground of fraud, coercion or undue influence, the burden is upon the husband to show not only that the transaction was free from any taint of fraud, coercion or undue influence on his part, but that the wife acted with full knowledge of the property involved and her rights therein, and that the settlement was fair and equitable." (Citing cases from Idaho, Kentucky, Texas, New York, Oklahoma, California and Washington.) 360 P.2d at 1001.

The Court in *Sande* also states:

"In addition to the rule placing the burden of proof on the husband, as above stated, there is a further general rule that where the separation agreement is inequitable and unfair to the wife, and where it manifestly appears that there has been overreaching on the part of the husband, equity will not enforce the agreement, but will grant relief to the wife, even though no actual fraud or duress was resorted to by the husband in procuring it. (Authorities supra.) Although not necessarily so limited, this rule is especially applicable where the wife was ignorant of her rights, and acted without independent counsel. In such cases, if the wife's remedy is not barred by limitations, laches or estoppel, she may maintain an independent action therefor." 360 P.2d at 1003.

Obviously, in view of these apparent inequities in the case the Court below adopted either the rule and procedure in the *Sande* case, or one similar to it, as evidenced by its Conclusions of Law numbered 2 and 3. We feel the trial court adopted the proper rule which is supported by the best reasoned decisions in community property states.

Although appellant attempts to distinguish the *Sande* case and the cases cited in support thereof, on the basis that some of the cases (not Sande) involved agreements made in contemplation of divorce, strained relations of the parties, or financial stress on the part of the wife, we do not feel this should prevent adoption of the *Sande* rule. Married women during the marriage relationship are less likely to realize the necessity for investigating the bona fides of the husband's actions than those who face the actuality of a termination of their marriage.

In Arizona, the husband is the manager of the community, Pendleton v. Brown, 25 Ariz. 604, 221 P. 213 (1923). The relationship between husband and wife is a confidential one, and the husband is in a position "analogous to that of a trustee." Spector v. Spector, 94 Ariz. 175, 382 P.2d 659 (1963).

■ We do not hold that all contracts or agreements between husband and wife in Arizona are presumptively void or fraudulent. We merely hold that when attacked by a wife on the grounds that the transaction was fraudulent or coerced, or is inequitable and unfair, the wife may have a judicial determination at that time whether the agreement is invalid as to her, and that it is the husband's burden to prove by clear and convincing evidence that the agreement was not fraudulent or coerced, or that it was not unfair or inequitable.

■ The Court below imposed this burden of proof upon appellants, and found on the evidence that they did not carry it. The evidence justifies this conclusion. Having thus found, the Court correctly required the appellants to establish the separate character of the property, and finding that they had not, declared it all community. The evidence justifies the findings and conclusions in this regard.

■ The issues of whether by her conduct over the years after the execution of the agreement Mrs. Harber had ratified the voidable agreement or had become estopped to deny its validity were properly before the Court. Although no specific findings of fact or conclusions of law were made by the Court on these issues, they may be implied from Finding No. 13. The trial court will be deemed to have made every finding of fact necessary to support its judgment. Arizona Commercial Min. Co. v. Iron Cap Copper Co., 29 Ariz. 23, 239 P. 290 (1925). Further, when the findings of the trial court either specifically made or implied from the previous rule are supported by reasonable evidence, or based on a reasonable conflict of the evidence, they will not be disturbed by this Court. (Arizona Comm. Min. Co., supra.) We find that there was reasonable evidence in the case from which the Court could have concluded that the defenses of ratification or estoppel were not proven.

This Court had reserved its ruling on Appellee's Motion to Dismiss the Appeal, based on the contentions that the co-executors were not proper parties in a petition to determine heirship, as they are to be considered as merely stakeholders of the assets of the estate and should not be concerned as to who should be entitled to distribution of the property. They allege that the co-executors are not "aggrieved parties" by the trial court's judgment that the property involved in the estate was community property, rather than separate.

By the terms of Dr. Harber's Will, the bulk of the estate, after a small portion thereof was to be set up in a testamentary trust for the continued support of Mary and others, was to be distributed to a charitable trust for medical purposes called the Harber Foundation, in which the co-executors were to act also as trustees.

Our Court in the case of In the Matter of the Estate of Sullivan, 51 Ariz. 55, 74 P.2d 346 (1937), quoted with approval In re Wah-kon-tah-he-ump-ah's Estate, 128 Okl. 179, 261 P. 973 (1927), as follows:

"The law authorizes the making of a will, and the law requires that the property be distributed under the terms of the will, if it be valid, and the desires of the testator as expressed in the will are substituted for the statute on descent and distribution, and becomes in such case the law as to the manner of distribution. It is therefore as much the duty of an executor to enforce the terms of a valid will as it is of an administrator to enforce the provisions of the statute." 51 Ariz. at 61, 74 P.2d at 348.

■ We adopt the rule as set forth in the California case of In re Corotto, 125 Cal.App.2d 314, 270 P.2d 498 (1954), that after a will has been admitted to probate, it is the duty of the executor to defend and uphold it against subsequent attack, and that this duty rests primarily upon him and not the legatees and devisees.

■ Therefore, It is ordered that Appellee's Motion to Dismiss the Appeal is denied, and that the judgment of the trial court is affirmed.

UDALL, V. C. J., and STRUCKMEYER, BERNSTEIN and LOCKWOOD, JJ., concur.

NOTE: Chief Justice ERNEST W. McFARLAND having announced his disqualification, the Honorable FRANK X. GORDON, Jr., Judge of Superior Court of Mohave County, was called to sit in the determination of this appeal.