IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

VALER C. AUSTIN,
*Petitioner/Defendant/Appellee,*

VALERIE A. GORDON,
*Defendant/Cross-Claimant/Appellee,*

ALBERT H. GORDON III,
*Defendant/Cross-Claimant/Appellee,*

*v.*

JOSIAH T. AUSTIN,
*Respondent/Plaintiff/Cross-Defendant/Appellant.*

No. 2 CA-CV 2014-0134
Filed April 30, 2015

---

Appeal from the Superior Court in Pima County
Nos. D20134007 and C20140235 (Consolidated)
The Honorable Dean Christoffel, Judge Pro Tempore

**AFFIRMED**

---

COUNSEL

DePasquale & Schmidt, PLC
By Paul G. Schmidt and Mark DePasquale, Phoenix

The McCarthy Law Firm, P.L.L.C.
By Kathleen A. McCarthy, Tucson
*Counsel for Petitioner/Defendant/Appellee Valer C. Austin*

Snell & Wilmer L.L.P.
By Kevin J. Parker, Phoenix
*Counsel for Defendant/Cross-Claimant/Appellee Valerie A. Gordon*

Russell B. Stowers, PLLC
By Russell B. Stowers, Tucson
*Counsel for Defendant/Cross-Claimant/Appellee Albert H. Gordon III*

Gabroy, Rollman & Bossé, P.C.
By Richard M. Rollman and Richard A. Brown, Tucson
*Counsel for Respondent/Plaintiff/Cross-Defendant/Appellant Josiah T. Austin*

---

**OPINION**

Presiding Judge Miller authored the decision of the Court, in which Chief Judge Eckerstrom and Judge Espinosa concurred.

---

M I L L E R, Judge:

**¶1**　　Josiah Austin appeals from the trial court's judgment denying his motion to compel arbitration.  For the following reasons, we affirm.

**Factual and Procedural Background**

**¶2**　　In reviewing a denial of a motion to compel arbitration, we must defer to the trial court's factual findings unless clearly erroneous.  *Harrington v. Pulte Home Corp.*, 211 Ariz. 241, ¶¶ 8, 16, 119 P.3d 1044, 1048, 1049-50 (App. 2005).  None of the parties directly challenges the court's factual findings under this standard.[1]

---

[1]We note, however, that Josiah, for the first time in his reply brief, alleges several of the trial court's factual findings are clearly erroneous.  But "[w]e will not consider arguments made for the first time in a reply brief."  *Dawson v. Withycombe*, 216 Ariz. 84, ¶ 91, 163 P.3d 1034, 1061 (App. 2007).

Given the complex nature of the underlying property transactions in the case before us, a detailed review of the factual background is necessary.

¶3 Josiah and Valer Austin were married in 1982. Valer has two children by a previous marriage (hereinafter "children"). Valer had inherited substantial property before her marriage to Josiah. Early in the marriage, Valer agreed to Josiah's management of a portion of her assets with the understanding that the majority of the assets would continue to be managed by third parties and monitored by Josiah.

¶4 Valer, in her estate planning, wished to ensure that certain of her property would be transferred to the children at specific future dates. Accordingly, in November 1987, Valer created two Grantor Retained Income Trusts (GRITs)[2] for the benefit of her children. The Valer C. Austin Trust I dated November 19, 1987 (Valer GRIT) was created as an irrevocable trust for a period of 15 years, with the children designated as the beneficiaries, and was funded by Valer's separate property. The Josiah Austin Trust I dated December 17, 1987 (Josiah GRIT) was created as an irrevocable trust for a period of 20 years with the children designated as the beneficiaries. Although Josiah was shown as the grantor of the assets in the Josiah GRIT, those assets too were derived from Valer's separate property.

¶5 In 1996, Josiah was appointed trustee of the GRITs and, in 1997, El Coronado Holdings, LLC (ECH) was formed. The 1997 ECH operating agreement shows the initial members as Josiah, Valer, the Josiah GRIT, and the Valer GRIT. Directly pertinent provisions of the 1997 operating agreement include:

_____

[2]"The GRIT is a variation on the inter vivos gift, which has long been used by taxpayers as an estate-planning strategy designed to reduce transfer-tax liability." Mitchell M. Gans, *GRIT's, GRAT's and GRUT's: Planning and Policy*, 11 Va. Tax Rev. 761, 763 (1992). The GRIT was recognized in the 1980s as a particularly attractive method by which to effect an inter vivos gift and was therefore one of the most popular estate-planning strategies. *See id.*

a. Josiah was designated as the sole manager with absolute, exclusive authority, power, and discretion to act on behalf of ECH, which provided Valer with no authority or control over the assets transferred into ECH.

b. Josiah's removal as manager required the affirmative vote of members holding two-thirds of the ownership interests, which, given the size of holding attributable to Josiah under the agreement, made it impossible for Valer or any other member to remove Josiah without his consent.

c. Withdrawal by a member constituted a breach of the 1997 operating agreement, permitting ECH to recover damages as an offset against any amount distributable to the withdrawing member. The amount of damages was determined in the Manager's sole discretion.

d. Josiah had the sole power to determine whether distributions would be made to members and, if so made, whether or not it would be distributed on a pro-rata basis.

e. All disputes among members were to be arbitrated if they could not be resolved through mediation.

¶6        Josiah and Valer signed the 1997 operating agreement in August 1997. Valer testified she had signed the 1997 operating agreement without reading it and without knowing it contained an arbitration provision. Josiah testified it was possible he only gave the signature page of the 1997 operating agreement to Valer and told

4

her to sign it. Valer testified she had not seen the 1997 operating agreement before she signed it and it was her practice to trust her husband as to signing what he put in front of her. Valer was not advised about the operating agreement, its arbitration clause, or its effect on her rights or property.

¶7 In January 2000, Valer signed a document creating the Austin Family Revocable Trust. Valer was not advised that the family trust document might transmute her sole and separate property into community property, nor was she advised of the significant effects of transmuting sole and separate property to community property in the event of a divorce. The family trust document did not describe which assets would be transferred into that trust nor was Valer so advised. As of August 1997, the value of Valer's separate property brokerage account, which Josiah had transferred into ECH, was valued at approximately $58 million.

¶8 In April 2005, Josiah provided Valer with the signature page for an Amended and Restated Operating Agreement for ECH effective April 16, 2005 (2005 operating agreement). Valer was not provided the text of the rest of the 2005 operating agreement and signed it based on Josiah's direction. The 2005 operating agreement amended the members of ECH to include: the Austin Family Revocable Trust, the Josiah GRIT, and the Valer GRIT. In the 2005 operating agreement, Josiah was once again designated as the sole manager of ECH, and a vote of ninety percent of the ECH members was required to remove him as manager.

¶9 In November 2013, Valer filed a petition for dissolution of marriage from Josiah. Soon after, Valer moved for joinder of the children as additional parties necessary to resolve disputes regarding the management of ECH.[3] In January 2014, Josiah filed a

---

[3] Valer also moved to join the Chisos Trust and Hanu Holdings, LLC as members of ECH. In 2010, the Chisos Trust was funded with assets previously held in the Josiah GRIT and was created to hold assets in trust for the children's lifetimes. Chisos Trust included Chisos 1 and Chisos 2. In December 2010, the entirety of the membership interest of Chisos 2 in ECH was transferred to Hanu Holdings, LLC.

civil complaint against Valer and the children seeking to compel arbitration of the ECH dispute. The trial court granted Valer's motion to join the children as necessary parties as well as her motion to consolidate Josiah's civil case with the dissolution proceeding. In March 2014, the children filed a cross-claim against Josiah. In response, Josiah moved to compel the children to arbitrate their cross-claims.

¶10 After a two-day evidentiary hearing the trial court issued an under advisement ruling and signed order denying Josiah's motions to compel arbitration. Josiah timely filed this notice of appeal, and we have jurisdiction pursuant to A.R.S. § 12-2101.01(A)(1).

**Valer's Claims**

¶11 Josiah argues the trial court erred when it improperly applied the heightened standards of *In re Harber's Estate*, 104 Ariz. 79, 449 P.2d 7 (1969), instead of ordinary contract principles in its analysis of the arbitration agreement, as it concerned Valer and him. Our review of this issue is de novo. *Smith v. Pinnamaneni*, 227 Ariz. 170, ¶ 7, 254 P.3d 409, 412 (App. 2011).

¶12 Although public policy supports arbitration agreements, "'[o]nly when the arbitration provision is enforceable will the court compel arbitration.'" *WB, The Building Company, LLC v. El Destino, LP*, 227 Ariz. 302, ¶ 11, 257 P.3d 1182, 1186 (App. 2011), *quoting Stevens/Leinweber/Sullens, Inc. v. Holm Dev. & Mgmt., Inc.*, 165 Ariz. 25, 30, 795 P.2d 1308, 1313 (App. 1990) (alteration in *WB*). An arbitration provision is not valid or enforceable where "a ground exists . . . at law or in equity for the revocation of a contract." A.R.S. § 12-3006(A). Generally, "[l]egal or equitable grounds for revoking any contract include allegations that 'the contract is void for lack of mutual consent, consideration or capacity or voidable for fraud, duress, lack of capacity, mistake or violation of a public purpose.'" *Stevens/Leinweber/Sullens*, 165 Ariz. at 28-29, 795 P.2d at 1311-12, *quoting U.S. Insulation v. Hilro Const. Co.*, 146 Ariz. 250, 253, 705 P.2d 490, 493 (App. 1985).

¶13        In *Harber's Estate*, a husband and wife entered into a postnuptial agreement, not incident to or in contemplation of separation or divorce, which provided all property not otherwise described therein was to become the sole property of husband. *See* 104 Ariz. at 84, 449 P.2d at 12. Our supreme court concluded that marital partners may "validly divide their property presently and prospectively by a post-nuptial agreement" but such an agreement must include built-in safeguards to ensure the agreement is "free from any taint of fraud, coercion or undue influence; that the wife acted with full knowledge of the property involved and her rights therein, and that the settlement was fair and equitable." *Id.* at 88, 449 P.2d at 16. Accordingly, although "all contracts or agreements between husband and wife in Arizona are [not] presumptively void or fraudulent," our supreme court held that spouses may enter a contract to divide their property outside a divorce or separation, but that when such a postnuptial agreement is

> attacked by a wife on the grounds that the transaction was fraudulent or coerced, or is inequitable and unfair, the wife may have a judicial determination at that time whether the agreement is invalid as to her, and that it is the husband's burden to prove by clear and convincing evidence that the agreement was not fraudulent or coerced, or that it was not unfair or inequitable.[4]

*Id.*

¶14        We therefore examine whether the ECH operating agreement is a postnuptial agreement governed by the principles outlined in *Harber's Estate*. A postnuptial agreement is defined as

---

        [4] Although *Harber's Estate* employs antiquated language indicative of its time, the principle applied therein—that the relationship between spouses is confidential and fiduciary—is still applicable today. *See* 104 Ariz. at 88, 449 P.2d at 16; *Gerow v. Covill*, 192 Ariz. 9, ¶ 40, 960 P.2d 55, 64 (App. 1998) (holding that fiduciary relationship exists between spouses).

"[a]n agreement entered into during marriage to define each spouse's property rights in the event of death or divorce." Black's Law Dictionary 1356 (10th ed. 2014).

**¶15** Both the ECH 1997 operating agreement and the 2005 operating agreement, as well as the arbitration clauses, were made between Josiah and Valer while husband and wife. ECH was created to allow the Austins to obtain discounts on the valuation of the LLC assets and tax savings for the surviving spouse when either Josiah or Valer died, or for Valer's children when one or both of them passed. As the trial court found, the operating agreements placed "severe and permanent" limitations on Valer's property rights and resulted in a significant transfer of authority to Josiah, such that the operating agreements affected Valer's property rights "to the same or greater extent than would a post-nuptial property settlement agreement."

**¶16** Josiah argues that *Harber's Estate* is limited only to postnuptial property division agreements and "should not be extended to all business agreements between spouses." But Josiah's attempt to characterize the ECH operating agreements as arm's-length business transactions between spouses is unavailing. Substantial evidence supports the trial court's finding that the net effect of the operating agreements was to place permanent and significant limitations on Valer's property rights, arguably including the transformation of separate property to community property.[5] Despite the sophistication of the legal instruments employed, the impact of the operating agreements was no less severe than a more traditional postnuptial property division agreement.

---

[5]Josiah asserted at oral argument that the documents did not automatically transform Valer's separate property to community property. But he qualified this assertion with the limitation that the trial court would decide later if some or all of her separate property was transformed, presumably on the basis of the subject documents. This distinction in timing does not constitute a meaningful difference.

¶17 Josiah correctly observes that all subsequent Arizona cases applying the requirements outlined in *Harber's Estate* have been applied to marital property division agreements. *See Wick v. Wick*, 107 Ariz. 382, 384-85, 489 P.2d 19, 21-22 (1971); *Breitbart-Napp v. Napp*, 216 Ariz. 74, 76, 163 P.3d 1024, 1026 (App. 2007); *Sharp v. Sharp*, 179 Ariz. 205, 207, 877 P.2d 304, 306 (App. 1994); *Keller v. Keller*, 137 Ariz. 447, 448, 671 P.2d 425, 426 (App. 1983). But Josiah points to no authority, and we are aware of none, that precludes application of *Harber's Estate* to the facts before us. Unlike the agreements at issue in the cases cited by Josiah, both the postnuptial agreement in *Harber's Estate* and the operating agreements between Josiah and Valer were made at a time when separation or divorce was not imminent or contemplated. *See Harber's Estate*, 104 Ariz. at 84, 449 P.2d at 12.

¶18 Josiah also relies on *Bell-Kilbourn v. Bell-Kilbourn*, 216 Ariz. 521, ¶¶ 8-11, 169 P.3d 111, 113-14 (App. 2007), and *Bender v. Bender*, 123 Ariz. 90, 94, 597 P.2d 993, 997 (App. 1979), to distinguish *Harber's Estate*. But both cases involved disclaimer deeds and both are clear that such deeds are not analyzed as postnuptial agreements. *See Bell-Kilbourn*, 216 Ariz. 521, ¶¶ 9-10, 169 P.3d at 113-14; *Bender*, 123 Ariz. at 93-94, 597 P.3d at 996-97. Moreover, both *Bell-Kilbourn* and *Bender* explicitly noted that the issue of mistake or fraud had not been raised. *See Bell-Kilbourn*, 216 Ariz. 521, ¶ 9, 169 P.3d at 114; *Bender*, 123 Ariz. at 94, 597 P.2d at 997. Therefore, these cases are inapposite.

¶19 Finally, Josiah contended at oral argument that application of *Harber's Estate* in this context would result in the need for separate counsel for both spouses before creating trusts or other complex estate documents, which would burden the delivery of legal services. To the extent that separate property is transferred to the community estate, or even significant limitations are placed on separate property, lawyers have always had to consider whether joint representation is possible or nonconsentable. *See, e.g.*, ER 1.7, Ariz. R. Prof'l Conduct, Ariz. R. Sup. Ct. 42. Even if separate counsel is deemed necessary to ensure the independence and loyalty of counsel's advice, it preserves "essential elements in the lawyer's relationship to a client." *Id.* at cmt. 1. Although we do not see our

holding as an expansion of *Harber's Estate*, if there is an increase in independent legal advice, it will be for a permissible and laudable purpose.

¶20        In sum, the mere use of a limited liability company to effectuate changes to the property rights of spouses does not transmute such an agreement into an arm's-length business transaction as Josiah suggests.  The trial court did not err in applying the requirements in *Harber's Estate* to the facts of the instant case.  Because the operating agreements were made during Valer and Josiah's marriage and altered each spouse's property rights in the event of death, the ECH operating agreements meet the definition of a postnuptial agreement.  Therefore, the requirements of *Harber's Estate* apply.  *See* 104 Ariz. at 88, 449 P.2d at 16.  The court did not err when it required Josiah to demonstrate by clear and convincing evidence that Valer was aware of the property subject to the arbitration provision or advised of the effect of the arbitration provision, or her rights therein.

¶21        Josiah argues in the alternative that "under ordinary contract law principles, a party is bound by the terms of an agreement that she signs without reading it."  Although we agree with Josiah's contention as a general legal principle, he does not provide Arizona authority applying that principle to a postnuptial agreement.  *See Jones v. Chiado*, 137 Ariz. 298, 298-99, 670 P.2d 403, 403-04 (App. 1983) (dispute between real estate developers); *Harrington*, 211 Ariz. 241, ¶ 2, 119 P.3d at 1046 (dispute between homeowners and homebuilder); *Rocz v. Drexel Burnham Lambert, Inc.*, 154 Ariz. 462, 463, 743 P.2d 971, 972 (App. 1987) (dispute between securities brokerage firm and client).  Thus, we find the cited cases unpersuasive in the context of a postnuptial agreement that falls under *Harber's Estate*.  To the extent Josiah argues we should overrule the holding in *Harber's Estate* to analyze postnuptial agreements the same as all commercial agreements under ordinary contract law, this court is bound by the decisions of our supreme court and must apply the law it has declared.  *See Bazzanella v. Tucson City Court*, 195 Ariz. 372, ¶ 8, 988 P.2d 157, 161 (App. 1999).

**The Children's Claims**

**¶22**      Josiah argues the trial court erred in concluding that the children were not bound by the arbitration agreement.  Although he concedes the children were not signatories to either the 1997 or 2005 operating agreement, he contends they are intended beneficiaries and therefore estopped from avoiding arbitration.   We review separately, but de novo, whether the children's claims are subject to arbitration.  *See Estate of Decamacho ex rel. Guthrie v. La Solana Care and Rehab, Inc.*, 234 Ariz. 18, ¶ 9, 316 P.3d 607, 609-10 (App. 2014).  We also review a trial court's decision not to apply estoppel for an abuse of discretion.  *Flying Diamond Airpark, LLC v. Meienberg*, 215 Ariz. 44, ¶ 27, 156 P.3d 1149, 1155 (App. 2007).  "To constitute an abuse of discretion, the [trial] court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous."  *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000); *see also City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, ¶ 65, 181 P.3d 219, 237 (App. 2008).

**Third-Party Beneficiary**

**¶23**      With certain exceptions, the general rule is that an arbitration agreement is binding only on parties to the agreement. *Dueñas v. Life Care Ctrs. of Am., Inc.*, 236 Ariz. 130, ¶ 26, 336 P.3d 763, 772 (App. 2014).   Courts have made clear, however, that a "nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency,'" *Thomson-CSF, S.A. v. Amer. Arbitration Ass'n*, 64 F.3d 773, 776 (2d. Cir. 1995), *quoting McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980).  Although "there is a dearth of Arizona precedent" on arbitration-by-estoppel, *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 261 (5th Cir. 2014) (applying Arizona law), the third-party beneficiary doctrine is one of the established grounds upon which a party to an arbitration agreement can require a nonsignatory to arbitrate, *see Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356, 362 (5th Cir. 2003).

**¶24**      Under the third-party beneficiary exception, a non-signatory party may be barred from avoiding arbitration if he has

received a direct benefit from the arbitration agreement. *Schoneberger v. Oelze*, 208 Ariz. 591, ¶ 14, 96 P.3d 1078, 1081 (App. 2004). "Arbitration rests on an exchange of promises," and "[p]arties to a contract may decide to exchange promises to substitute an arbitral for a judicial forum." *Id.* ¶ 20. In evaluating whether the third-party beneficiary theory applies to a particular arbitration agreement, "a court must look to the intentions of the parties at the time the contract was executed." *Id.* n. 6, *quoting Bridas S.A.P.I.C.*, 345 F.3d at 362.

¶25        The trial court found "that the children did not receive benefits directly from ECH that they were not already entitled to receive as beneficiaries of the GRITs." Additionally, the court found that the children's "interests in the GRITs were detrimentally impacted by Josiah putting the GRIT assets into ECH without their knowledge or consent." Therefore, it concluded the ECH operating agreement was not enforceable against the children.

¶26        Josiah contends the trial court erred in finding the children did not receive a direct benefit from the ECH operating agreement because the children were "intended to benefit from ECH as the ultimate heirs of the ECH assets, which would be substantially discounted in value for estate tax purposes." This argument lacks support in the record. For instance, the children would not receive any additional estate tax benefit for the GRIT assets by being included in ECH, at least as long as the children are alive, as acknowledged at the hearing by the Austins' attorney. To the extent Josiah also claims the children would receive a federal estate tax discount on the non-GRIT assets in ECH, the evidence at the hearing demonstrated that the ECH structure, combined with another family trust created by Josiah, was a vehicle that would allow Josiah to take all of these assets for himself, to the exclusion of the children, should Valer predecease Josiah. Thus, even assuming arguendo the third-party beneficiary doctrine can be applied in circumstances in which the benefit has not yet been received, the benefits Josiah alleges the children will enjoy are entirely contingent on whether Valer predeceases Josiah, an outcome that is by no means assured. Accordingly, any tax benefits the children might enjoy are speculative in nature.

¶27        Josiah also argues the children were intended to benefit from "the asset protection features of ECH."   To the contrary, however, any judgment creditor of the children could obtain a charging order against ECH, and thereby "intercept" any ECH assets that might otherwise be paid to the children.  *See* A.R.S. § 29-655(A) (upon court order, judgment creditor "may charge the member's interest in the limited liability company with payment of the unsatisfied amount of the judgment plus interest").  In addition, by placing the GRIT assets into ECH, the children may have those assets exposed to ECH's creditors.

¶28        In sum, the record discloses no evidence of a benefit or exchange of promises between Josiah and the children.  Here, the children do not seek any benefits under the arbitration agreement; in fact, they claim "that ECH and/or its Operating Agreement were invalid from inception."   In addition, as this court pointed out in *Schoneberger*, a non-party to an arbitration agreement must receive a *direct* benefit from the agreement if they are going to be required to abide by the arbitration.  *See* 208 Ariz. 591, ¶¶ 13-14, 96 P.3d at 1081; *see also E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 196-97 (3d Cir. 2001) ("[I]f it was not the promisee's intention to confer direct benefits upon a third party, but rather such third party happens to benefit from the performance of the promise either coincidentally or indirectly, then the third party will have no enforceable rights under the contract."). No such direct benefit is present here.

**Direct Benefits Estoppel**

¶29        Josiah next argues the children are compelled to arbitrate under the direct benefits estoppel theory because their cross-claims must be determined by reference to the arbitration agreement.  Under direct benefits estoppel, a nonsignatory may be compelled to arbitrate only when the nonsignatory (1) knowingly exploits the benefits of an agreement containing an arbitration clause, or (2) seeks to enforce terms of that agreement or asserts claims that must be determined by reference to the agreement.  *See Reid v. Doe Run Res. Corp.*, 701 F.3d 840, 846 (8th Cir. 2012).

¶30      As noted above, the children do not benefit from the ECH operating agreement; instead their interests "were detrimentally impacted by Josiah putting the GRIT assets into ECH without their knowledge or consent." Thus, the children cannot be said to have knowingly exploited the benefits of the ECH operating agreement. We therefore next examine whether the children seek to enforce terms of the ECH operating agreement or assert claims that must be determined by reference to the agreement.

¶31      In making this determination, we must "'look past the labels the parties attach to their claims to the underlying factual allegations.'" *Id.* at 848, *quoting 3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1199 (8th Cir. 2008). Although it is true that one or more of the children's alternative cross-claims may require reference to the ECH operating agreement, the principal factual allegation underlying the children's cross-claims is that the GRITs should never have been transferred into ECH and that they are involuntary members of ECH. As the trial court concluded, the alternative relief sought by the children in their cross-claim applies only if the court deems the ECH structure to be binding on them. Such a contingency, to which they object, is not sufficient to create estoppel that requires the children to arbitrate their claims. Thus, the children are not estopped from avoiding arbitration, and the trial court did not err by finding the arbitration provision unenforceable against them.

## Scope of Trial Court's Findings

¶32      Josiah argues the "trial court failed to limit itself to the questions of whether an arbitration agreement exists and whether the parties were bound by it." He cites A.R.S. § 12-3006 and *National Bank of Arizona v. Schwartz*, 230 Ariz. 310, ¶ 4, 283 P.3d 41, 42 (App. 2012), for the proposition that a reviewing court is limited in its review to the determination of whether an arbitration agreement exists and whether the parties are bound by that agreement. But to the extent the court made findings such as the source of the securities that funded the GRITs and ECH was Valer's sole and separate property, such findings were necessary to determine whether the operating agreement was fraudulent or coerced, or whether it was unfair or inequitable. *See Harber's Estate*, 104 Ariz. at 88, 449 P.2d at 16. Accordingly, the court did not err in the scope of

its findings in determining whether the arbitration agreement was enforceable as to Valer and the children.[6]

## Language of Arbitration Agreement

**¶33** Josiah raises several arguments related to the trial court's determination that the plain language of the arbitration clause did not permit Josiah, as manager of ECH, to enforce the arbitration agreement. Because we affirm the court's denial of Josiah's motions to compel arbitration on other grounds, we need not address them.

## Attorney Fees

**¶34** The parties request attorney fees pursuant to A.R.S. § 12-341.01, under which a court may award reasonable fees to the successful party in an action arising out of contract. But we have interpreted § 12-341.01 to mean that the ultimate prevailing party in an underlying action arising out of contract may be awarded attorney fees. *See U.S. Insulation*, 146 Ariz. at 259, 70 P.2d at 499. Because a decision on the merits has not yet been made in this case, we deny the attorney fees requests. *See id.*; *Esmark, Inc. v. McKee*, 118 Ariz. 511, 514, 578 P.2d 190, 193 (App. 1978).

## Disposition

**¶35** For the foregoing reasons, we affirm the trial court's ruling denying Josiah's motions to compel arbitration.

---

[6]We also note that Josiah, for the first time in his reply brief, asserts that we should "establish the proper procedures for findings on a motion to compel arbitration and direct that the case be reassigned." But again, we do not consider arguments made for the first time in a reply brief. *Dawson*, 216 Ariz. 84, ¶ 91, 163 P.3d at 1061. Accordingly, we deny as moot Valer and the children's joint motion to strike portions of the reply brief in which they request we strike those arguments made for the first time therein.