NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

RACHEL A. TURLEY, et al., *Plaintiffs/Appellees*,

*v.*

LEO R. BEUS, et al., *Defendants/Appellants*.

No. 1 CA-CV 15-0107
FILED 1-31-2017

Appeal from the Superior Court in Maricopa County
No. CV2014-009811
The Honorable Katherine M. Cooper, Judge

**AFFIRMED**

COUNSEL

Bryan Cave LLP, Phoenix
By J. Alex Grimsley, Robert J. Miller, Sean K. McElenney
*Counsel for Plaintiffs/Appellees*

Stinson Leonard Street LLP, Phoenix
By Michael C. Manning, James E. Holland Jr.
*Co-Counsel for Defendants/Appellants Cardon*

Moyes Sellers & Hendricks, Phoenix
By Keith L. Hendricks, Joshua T. Greer, Lawrence Palles
*Co-Counsel for Defendants/Appellants Cardon*

Osborn Maledon, P.A., Phoenix
By David B. Rosenbaum, Nathan Arrowsmith
*Counsel for Defendants/Appellants Beus/Nelson*

---

**MEMORANDUM DECISION**

Presiding Judge Kenton D. Jones delivered the decision of the Court, in which Judge Randall M. Howe and Judge Donn Kessler joined.

---

**J O N E S**, Judge:

¶1        Appellants appeal the trial court's orders denying their motion to compel arbitration.  For the following reasons, we affirm.

**FACTS[1] AND PROCEDURAL HISTORY**

¶2        This family dispute arose over an alleged promise by Wilford Cardon to give his son, Wil, 50% of the family's considerable assets in exchange for Wil's agreement to manage the family businesses.  Wilford disputed making such a promise to the detriment of his seven other children.[2]  In an attempt to settle the dispute, Wilford and Wil met with two high-ranking leaders of their church (the Church Leaders).

¶3        The meeting resulted in an agreement (the November 2013 Agreement), signed by Wilford and Wil, their wives, and the Church Leaders, all in their individual capacities, that granted Wil 35% of the total Cardon assets — 28.75% "as compensation" for his management services plus 6.25% as his inheritance — and allocated 6.25% of the assets to each of Wilford's seven other children.  The November 2013 Agreement also contained a provision whereby the numerous Cardon companies would be "governed by a board of directors" that "would include Wilford, Wil, another rotating family member, and others," with final selection to be determined by the Church Leaders.  The November 2013 Agreement purported to create a board of directors (the Board) for the purpose of

---

[1]        We view the facts in the light most favorable to upholding the trial court's ruling.  *Estate of DeCamacho ex rel. Guthrie v. La Solana Care & Rehab, Inc.*, 234 Ariz. 18, 19 n.1, ¶ 1 (App. 2014) (citing *Ruesga v. Kindred Nursing Ctrs., L.L.C.*, 215 Ariz. 589, 597, ¶ 26 (App. 2007)).

[2]        Neither Wilford nor one of Wil's siblings are parties to this appeal.

disentangling Cardon investments by selling the real estate properties in which those investments were held and distributing the liquidated cash to the various Cardon children in accordance with the agreed-upon schedule.

¶4         Leo Beus, a longtime attorney and friend of Wilford's, later averred that, shortly after the execution of the November 2013 Agreement, the Church Leaders had asked him "to take affirmative steps to . . . implement that Agreement" and "to serve on the Board." As part of these responsibilities, Beus informed Wil's brother, Patrick, that Patrick had been elected to the Board by a unanimous vote of the three then-existing Board members — Wilford, Wil, and Beus. Those four Board members further agreed to a five-member Board in total and selected Todd Nelson, who was to be "independent of all persons involved," as the final Board member. An initial Board meeting was scheduled for early December 2013. The Cardons' estate-planning attorney drafted a "Comprehensive Management Agreement" (the Management Agreement) in preparation for the initial Board meeting.

¶5         The parties to the Management Agreement purport to be Boa Sorte L.P., Rio Claro, Inc., and Harvard Capital L.P. (the Companies), all of which hold Cardon assets and are, in turn, owned by a number of irrevocable and multi-generational trusts.[3]  Section 1.1(a) of the Management Agreement grants the Board "sole and unfettered authority to make . . . any and all determinations . . . regarding the business and affairs of [the Companies] and all Cardon Assets . . . and decisions by the Board are binding and non-appealable by [the Companies] or any Cardon Family Member." Section 1.1(b) further asserts that the Board "shall also have full authority to consider and resolve any . . . disputes raised by any . . . Cardon Family Member, and the Board's decisions and actions shall be binding on . . . every Cardon Family Member, none of which shall have any right to litigate or arbitrate such decision unless" the Board's decision involved fraud or dishonesty related to self-dealing, in which case the matter would be resolved by a qualified arbitrator selected by the American Arbitration Association.

¶6         Upon reviewing the Management Agreement, Wilford specifically requested a right of appeal of Board decisions to the Church Leaders. The Board members unanimously agreed nothing in Section 1.1(b)

---

[3]     As of June 2014, eleven trusts had ownership interests in the Companies, with all parties involved — Wilford, Wil, Beus, Patrick, and five other Cardon children (the Siblings) — serving as a trustee or "power holder" for one of the various trusts.

would "limit the right of appeal" they agreed to in Section 1.9. As relevant here, Section 1.9 provides the right of appeal is "in the sole and absolute discretion" of the Church Leaders and "acknowledge[s] that it is the strong desire of [the Church Leaders] <u>not</u> to be a final arbiter of any dispute," but notes "[i]f the Appeal is considered, [the Church Leaders'] decision . . . shall be binding on the Board."

¶7 On the signature page, the Management Agreement establishes, with the signatures of the five Board members, that it is to be "binding on all signatories hereto and all Cardon Family Members concerning management of Cardon Assets as defined herein." Although the document has numerous signature blocks for the Board directors, managers of the Companies, trustees of the trusts, and individual Cardon family members, only Wilford and Patrick ever signed the Management Agreement, both of whom signed in December 2013. Additionally, Section 1.11 provides that "[t]he [Companies'] respective governing instruments shall be modified as soon as reasonably possible to expressly grant authority to the Board as provided for herein," but this did not occur.

¶8 Despite the attempt to settle disputes through the Management Agreement, family acrimony continued. Beus met with the Siblings in December 2013, where he purportedly circulated copies of the Management Agreement, but the document remained substantially unexecuted. Although the Siblings were not fully aware of the Board's involvement in managing the Cardon assets, Wilford, Patrick, and the Siblings[4] would consult either Beus or the Church Leaders for advice, and, in so doing, evidenced a basic understanding of the Board's structure and purpose. The Management Agreement's appeal provision, involving recourse to the Church Leaders, was first invoked in January 2014. At that time, the Church Leaders declined to consider the dispute, stating "[o]ur role never was and is not now to participate in the complex details of the Cardon Group. We have neither the time nor responsibility to understand the many issues. For this reason, we encouraged the forming of [the Board] . . . ."

¶9 The Board met in late December 2013 as well as January and March 2014 and discussed, among other issues, the value of two vacation homes to be transferred to Wilford and the Siblings such that Wil could be credited for his 35% share. Several emails from the Siblings to Beus in February 2014 continued to evince a rudimentary awareness of the Board

---

[4] Appellees include Patrick and the Cardon Siblings minus Wil and one Cardon child that is not a party to this appeal. *See supra* nn.2-3.

and its function in settling disputes within the Cardon family, and Beus referred to the Board's arbitration function in one of his responses. Moreover, Patrick communicated to the Board that he and the Siblings, together with Wilford, had created their own board — separate from the one created by the Management Agreement — and Patrick, as chairman of the alternate board, was "tasked to report the decisions and progress of the [Management Agreement's] Board to disentangle the assets owned by Boa Sorte, Rio Claro, and Harvard." Patrick also asked Beus how the Board intended to "handle the arbitration" on the property valuation issue so he could prepare for an April 2014 Board meeting and the "related arbitration process."

¶10 At the April 2014 Board meeting and alleged arbitration hearing, Wilford and Patrick presented materials acknowledging "Wilford, [Wilford's wife], and [the] Seven Siblings['] desire to separate the ownership and control of the [vacation homes]" and the Board's "authority to arbitrate disentanglement" as "empowered through the Comprehensive Management Agreement." Following the presentation, the Board rejected Wilford and Patrick's valuation, and Wilford and Patrick appealed the decision to the Church Leaders.

¶11 The Church Leaders replied "that it would be impossible and inappropriate for us . . . to sit in judgment on the large array of complex issues before the family, [and] we [have been] very grateful that those controlling the Cardon Group accepted to be governed by [the Board]." Thereafter, Wilford, Patrick, and the Siblings explicitly disavowed the Board's authority, repudiated the validity of the Management Agreement, and threatened Beus and Nelson with litigation. In late June 2014, Patrick requested that the Church Leaders dissolve the Board. The Church Leaders continued to reject any formal participation in the management of the Cardon assets:

> Through the past eight months, we have encouraged family members to find solutions through the [B]oard that was established. . . . After the request two weeks ago from two [B]oard members for a change in two other [B]oard members, we, for the first time, asked for a copy of the Comprehensive Management Agreement. . . . [W]e were surprised to learn that this agreement granted us legal authority with respect to the [B]oard, including . . . the power to accept, consider, and decide appeals from [B]oard decisions (paragraph 1.9). We believed our role was informal, and not legally binding. . . . So that there is no misunderstanding, we cannot accept and

refuse to accept the legal powers, responsibilities, and duties that the Management Agreement gives to us.

¶12    In July 2014, Appellees filed suit against Wil, Beus, and Nelson (Appellants), seeking: (1) a declaratory judgment that the November 2013 Agreement and the Management Agreement were void and unenforceable; (2) removal of Wil and Beus from their management and trustee positions in the Companies and the irrevocable trusts; (3) the appointment of a receiver for the Companies; and (4) a permanent injunction prohibiting Appellants from acting in their asserted capacities as members of the Board under the Management Agreement.   Appellants moved to compel arbitration of the issues before the Board pursuant to the terms of the Management Agreement.

¶13    The trial court held oral argument and, after taking the matter under advisement, issued a partial ruling in November 2014 concluding that the Siblings, "other than Patrick Cardon, are not signatories to the Management Agreement and are not bound by it.  They are not required to participate in [alternative dispute resolution (ADR)] with the Board."  As to Patrick, the trial court found his claims "are subject to ADR with the Board if the Management Agreement itself is valid and enforceable" but did not find the Agreement to be void as to Patrick "based on the [Church Leaders'] role."  The court reserved its final ruling pending submission of additional pleadings and argument regarding whether the Management Agreement was fully executed or whether requiring an ADR that allows Appellants to decide the charges against them was a legal absurdity.

¶14    After further pleadings and oral argument, the trial court ruled, in April 2015, that all Appellees, including Patrick, were "not required to submit their claims to ADR before the Board."   The court concluded the Management Agreement was unconscionable to the degree that it allowed Appellants to sit as binding arbitrators over the claims against them.  The court identified multiple, unresolved factual disputes regarding Appellees' ratification or acceptance of the Management Agreement and Board decisions and whether the Management Agreement may be voidable for mutual mistake resulting from the Church Leaders "want[ing] nothing to do with the MA or the Board."

**¶15**        Appellants timely appealed the denial of their motion to compel arbitration.  We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) sections 12-120.21(A)(1)[5] and -2101.01(A)(1).

## DISCUSSION

### I.        The Siblings Never Consented to the Purported Arbitration Agreement.

**¶16**        We begin with the general rule in Arizona that the courts, rather than arbitrators, decide the threshold, jurisdictional issue of whether parties have an existing agreement to arbitrate a particular dispute.[6] *Duenas v. Life Care Ctrs. of Am., Inc.*, 236 Ariz. 130, 140, ¶ 31 (App. 2014) (quoting A.R.S. § 12-3006(B)); *accord* A.R.S. § 12-1502(A); *Foy v. Thorp*, 186 Ariz. 151, 153-54 (App. 1996) (citing *City of Cottonwood v. James L. Fann Contracting, Inc.*, 179 Ariz. 185, 189-90 (App. 1994)). This determination is governed by general principles of contract law.  *Stevens/Leinweber/Sullens, Inc. v. Holm Dev. & Mgmt., Inc.*, 165 Ariz. 25, 28 (App. 1990).  And, it is axiomatic that an agreement does not exist unless it is legally enforceable.  *See, e.g.*, 17A Am. Jur. 2d *Contracts* § 1 (2016).

**¶17**        The validity and enforceability of an arbitration clause present mixed questions of fact and law subject to *de novo* review.  *Duenas*, 236 Ariz. at 135 n.1, ¶ 6 (quoting *DeCamacho*, 234 Ariz. at 20, ¶ 9).  We also review the denial of a motion to compel arbitration *de novo*.  *Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc. v. Robson*, 231 Ariz. 287, 291, ¶ 9 (App. 2012) (citing *Nat'l Bank of Ariz. v. Schwartz*, 230 Ariz. 310, 311, ¶ 4 (App. 2012)).  Notwithstanding our *de novo* review, we defer to the trial

---

[5]        Absent material changes from the relevant date, we cite a statute's current version.

[6]        Appellees argue Appellants rendered this appeal moot by conceding the Board lacks authority to arbitrate certain counts in Appellees' complaint involving the validity of the trusts or the Management Agreement as a whole.  However, in reviewing the denial of a motion to compel arbitration, such claims are outside this Court's jurisdiction in first deciding whether an agreement to arbitrate exists.  *Compare* A.R.S. § 12-3006(B) ("The court shall decide whether an agreement to arbitrate exists . . . ."), *with* A.R.S. § 12-3006(C) ("An arbitrator shall decide whether . . . a contract containing a valid agreement to arbitrate is enforceable."); *see also* A.R.S. § 12-3007(A)(2).

court's factual findings unless clearly erroneous. *Austin v. Austin*, 237 Ariz. 201, 204, ¶ 2 (citing *Harrington v. Pulte Home Corp.*, 211 Ariz. 241, 245, 246-47, ¶¶ 8, 16 (App. 2005)).

¶18 "Although public policy supports arbitration agreements, 'only when the arbitration provision is enforceable will the court compel arbitration.'" *Id.* at 206, ¶ 12 (quoting *WB, The Bldg. Co. v. El Destino, L.P.*, 227 Ariz. 302, 306, ¶ 11 (App. 2011)). In defining the validity and enforceability of an arbitration agreement, A.R.S. § 12-3006(A) states:

> An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable and irrevocable, except on a ground that exists at law or in equity for the revocation of a contract.

The legal and equitable grounds for revoking a contract include lack of mutual consent, consideration, or capacity; fraud, duress, or mistake; or procedural or substantive unconscionability. *Austin*, 237 Ariz. at 206, ¶ 12 (quoting *Stevens/Leinweber*, 165 Ariz. at 28-29); *Falcone Bros. & Assocs., Inc. v. City of Tucson*, 240 Ariz. 483, 490, ¶ 21 (App. 2016) (citation omitted).

¶19 Appellants argue the Siblings' signatures on the Management Agreement were not required to enforce the arbitration provision contained therein, *see Smith v. Pinnameneni*, 227 Ariz. 170, 177, ¶ 23 (App. 2011) ("Nonsignatories . . . can be required to arbitrate under certain circumstances.") (citations omitted), because they either: (1) impliedly accepted the arbitration agreement by their conduct; (2) designated Patrick as an agent to enter the agreement on their behalf; or (3) are estopped from now contesting the arbitration agreement because they availed themselves of the benefits of the Board's arbitration decisions before April 2014. As detailed below, Appellants have not met their burden in proving any circumstances existed such that the arbitration provision should be enforced against the Siblings as nonsignatories.

## A. Implied Consent and Assumption

¶20 A nonsignatory may be bound by an arbitration clause if his conduct indicates he is assuming the duty to arbitrate. *See Duenas*, 236 Ariz. at 139, ¶ 26 (citing *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003)); *see also Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995) (citations omitted). Indeed, an implied and enforceable agreement may be inferred from an individual's acts or conduct, though the burden of proving such an agreement is on the party

asserting it. *See Carroll v. Lee*, 148 Ariz. 10, 13 (1986); *Alexander v. O'Neil*, 77 Ariz. 91, 98 (1954) (citing *Kellogg v. Gleeson*, 178 P.2d 969, 972 (Wash. 1947)); *Johnson Int'l, Inc. v. City of Phx.*, 192 Ariz. 466, 470-71, ¶ 26 (App. 1998). However, "a distinct intent common to both parties must exist" before an enforceable agreement is created, "and until all understand alike there can be no contractual assent." *Hartford v. Indus. Comm'n*, 178 Ariz. 106, 112 (App. 1994) (citing *Hill-Shafer P'ship v. Chilson Family Tr.*, 165 Ariz. 469, 473 (1990)). Whether mutual assent exists is a factual question, resolved by consideration of objective evidence, "not the hidden intent of the parties." *Tabler v. Indus. Comm'n*, 202 Ariz. 518, 521, ¶¶ 12-13 (App. 2002) (citing *Callie v. Near*, 829 F.2d 888, 890-91 (9th Cir. 1987), and *Hartford*, 178 Ariz. at 112).

**¶21** Appellants attempt to meet their burden of proof through email communications indicating the Siblings had an opportunity to review the Management Agreement, were generally aware of the Board and its actions, and occasionally communicated familial disputes to Beus. Mere knowledge of a contract is not a sufficient manifestation of intent to be bound. *See Althaus v. Cornelio*, 203 Ariz. 597, 601, ¶ 17 (App. 2002) ("[T]he fact that one of the parties, *with the knowledge and approval of the other*, has begun performance is nearly always evidence that they regard the contract as consummated and intend to be bound thereby.") (quoting *Schade v. Diethrich*, 158 Ariz. 1, 10 (1988)). Moreover, Appellants admit they presented the Management Agreement, with explanation by Beus, to the Siblings, thereby providing them with a distinct and objective opportunity to unambiguously provide their consent to arbitration by signing; yet, the Siblings declined to do so. Appellants' evidence, in its totality, is insufficient to establish error in the trial court's factual finding that the Siblings did not intend to be bound to arbitration.

## B. Agency and Waiver

**¶22** The party asserting agency has the burden of showing the relevant person was in fact a nonsignatory's agent and, thus, had authority to bind the nonsignatory to an agreement. *See Escareno v. Kindred Nursing Ctrs. W., L.L.C.*, 239 Ariz. 126, 129, ¶ 7 (App. 2016) (citing *Goodman v. Physical Res. Eng'g, Inc.*, 229 Ariz. 25, 29, ¶ 12 (App. 2011), and Restatement (Third) of Agency § 6.01 (2006)); *see also Duenas*, 236 Ariz. at 139, ¶ 27 (noting agent "could not contractually limit [the principals'] personal claims without their assent"). "Apparent authority . . . arises when 'the principal intentionally or inadvertently induce[s] third persons to believe [a particular] person was his agent although no actual or express authority was conferred on him as agent.'" *Escareno*, 239 Ariz. at 130, ¶ 8 (quoting *Reed v. Gershweir*, 160 Ariz. 203, 205 (App. 1989)). Whether an agency

relationship exists is a question of fact. *Id.* at 129, ¶ 6 (quoting *Goodman*, 229 Ariz. at 29, ¶ 12, and *Salvation Army v. Bryson*, 229 Ariz. 204, 211, ¶ 23 (App. 2012)).

¶23          Appellants contend that Patrick's communication of his status as chairman of Wilford and Appellees' alternate board, coupled with the materials Patrick presented at the April 2014 meeting acknowledging the Board's authority to arbitrate, are sufficient to create an apparent agency relationship between Patrick and the other Appellees. However, Patrick's representations cannot prove apparent authority because such authority "can never be derived from the acts of the agent alone." *Reed*, 160 Ariz. at 205. The trial court found no evidence that the Siblings authorized Patrick to sign the Management Agreement or participate in Board proceedings on their behalf, and Appellants have not shown those findings were clearly erroneous.[7] And if Patrick was not the Siblings' agent at the April 2014 Board meeting, they cannot be found to have waived their objection to arbitration allegedly occurring at that meeting, given the Siblings did not attend, much less participate in, the meeting.

## C.    Estoppel and Third-Party Beneficiary

¶24          The equitable estoppel and third-party beneficiary doctrines each evaluate whether a nonsignatory has received benefits from an arbitration agreement or a contract containing an arbitration clause and, therefore, should be equitably barred from avoiding arbitration. *See Schoneberger v. Oelze*, 208 Ariz. 591, 594 n.6, ¶ 14 (App. 2004) (citing *Bridas*, 345 F.3d at 362), *superseded by* A.R.S. § 14-10205; *see also Austin*, 237 Ariz. at 208-09, 210, ¶¶ 23-24, 29 (citations omitted).

¶25          Appellants argue the Siblings accepted two primary benefits from Board decisions that compel them to arbitrate the present disputes — financial distributions and the implementation of a "timeout" between Wil and the rest of the family. Regarding the financial distributions, we cannot say the Siblings claimed any direct benefits from the Board's decision, given the Siblings were unaware they derived from Board action. *Austin*, 237 Ariz. at 210, ¶ 29 ("[A] nonsignatory may be compelled to arbitrate only when the nonsignatory . . . *knowingly* exploits the benefits of an agreement

---

7          Appellants also assert the Siblings themselves consented to Patrick representing their interests on the Board in the December 2013 meetings, an assertion the Siblings deny. These conflicting assertions were reconciled by the trial court, and we defer to the court's findings in the absence of clear error.

containing an arbitration clause . . . .") (emphasis added) (citation omitted). And though some of the Siblings acknowledged Beus' hand in directing the "timeout" between Wil and the family, such an informal and indirect benefit relative to an agreement designed to disentangle significant, illiquid financial assets is insufficient to overcome the court's discretionary findings and establish an equitable requirement to arbitrate under the Management Agreement. *See id.* at 209, ¶¶ 24, 28. Again, Appellants have not established error in the trial court's findings.

**II.      Mutual Mistake as to the Availability of an Appeal of the Board's Decisions Renders the Arbitration Agreement Void as to Patrick.**

**¶26**      Appellants argue the trial court erred in determining the arbitration agreement was unconscionable as to Patrick. Whether a contract is unconscionable and unenforceable are questions of law subject to *de novo* review. *See Duenas*, 236 Ariz. at 135 n.1, ¶ 6 (citations omitted). Accordingly, we may affirm the trial court for any reason supported by the record. *Navajo Nation v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 339, 344, ¶ 14 (App. 2012) (citing *St. Joseph's Hosp. v. Ariz. Health Care Cost Containment Sys.*, 185 Ariz. 309, 312 (App. 1996)); *WB*, 227 Ariz. at 309, ¶ 16 (citing *United Effort Plan Tr. v. Holm*, 209 Ariz. 347, 351, ¶ 24 (App. 2004)).

**¶27**      Procedural unconscionability addresses the fairness of the bargaining process, including whether mistakes of important facts occurred. *Duenas*, 236 Ariz. at 135, ¶ 8 (quoting *Clark v. Renaissance W., L.L.C.*, 232 Ariz. 510, 512, ¶ 8 (App. 2013)). "A mutual mistake exists where there has been a meeting of the minds of the parties and an agreement is actually entered into, but the agreement contains a mistake regarding an essential part of the contract." *Hartford*, 178 Ariz. at 111 (citing *Renner v. Kehl*, 150 Ariz. 94, 97 (1986), and *Hill-Shafer*, 165 Ariz. at 473); *see also* Restatement (Second) of Contracts § 152 cmt. b (1981) ("A mistake of both parties does not make the contract voidable unless it is one as to a basic assumption on which both parties made the contract."). A party seeking to rescind an agreement on the basis of mutual mistake must do so through clear and convincing evidence. *Estate of Nelson ex rel. Franz v. Rice*, 198 Ariz. 563, 566, ¶ 7 (App. 2000) (citing *Emmons v. Superior Court*, 192 Ariz. 509, 513, ¶ 15 (App. 1998)).

**¶28**      Appellees argue clear and convincing evidence exists to show the Church Leaders were never aware of nor consented to binding appellate jurisdiction over Board decisions, an integral provision of the arbitration agreement for which all Board members, including Patrick, specifically negotiated. Appellants counter with the assertion that the Church Leaders

were merely exercising their right of discretionary review under the Management Agreement, or, alternatively, Patrick had already been put on notice that the Church Leaders would not issue binding decisions. Although the discretionary nature of the Management Agreement's appeal provision is clearly delineated, the record portrays a fundamental misunderstanding regarding the binding force of the appeal provision.

¶29        Before the Management Agreement's creation, the Board negotiated and discussed a right of a binding appeal to the Church Leaders "so that the board would have a safety check on its decision making." An appeal provision was included within the Management Agreement that stated the Church Leaders would act as binding arbitrators of disputed Board decisions. Yet, eight months later, when the Church Leaders reviewed a copy of the Management Agreement for the first time, they unequivocally "refuse[d] to accept the legal powers, responsibilities, and duties that the Management Agreement" gave to them. *See supra* ¶ 11. Although the Church Leaders had "denied review" once before, in January 2014, their statements at the time were not so unmistakable as to lead Patrick to believe they would never issue a binding decision regarding Board action. *See supra* ¶ 8. And there is a fundamental distinction between denying review of a particular dispute and universal unwillingness to participate in binding arbitration.

¶30        Considering the evidence as a whole, clear and convincing evidence exists to establish the appeal provision was a basic tenet of the arbitration agreement (which comprises both Section 1.1(b)'s grant of arbitration authority to the Board and Section 1.9's right of appeal). Because both parties were mistaken regarding their understanding of the Church Leaders' role in review of the Board's decisions, Section 1.9 is a nullity and the entire arbitration agreement is unenforceable as to Patrick. On this basis, we hold, as a matter of law, that Patrick is not bound by the arbitration agreement on the grounds of mutual mistake.[8]

¶31        We are mindful of Appellants' argument that Patrick waived his objection to the April 2014 Board meeting and alleged arbitration hearing. *See* A.R.S. § 12-3023(A)(5) ("[T]he court shall vacate an award made in the arbitration proceeding if . . . [t]here was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising [an] objection [concerning lack of notice] not later than the

---

[8]        Because the existing record supports this determination, Appellees' motion to supplement the record on appeal is denied.

beginning of the arbitration hearing."); *see also Pinnamaneni*, 227 Ariz. at 177, ¶ 24 ("[O]ne who consents to arbitration without objection — even when there is no binding contract . . . — must abide by the arbitrator's decision . . . .") (citing *Verdex Steel & Constr. Co. v. Bd. of Supervisors*, 19 Ariz. App. 547, 550 (1973)). But in our *de novo* interpretation of the arbitration agreement, we construe Section 1.1(b)'s Board arbitration proceedings and Section 1.9's right of appeal to the Church Leaders as inextricable parts of the whole agreement to arbitrate.

¶32    As applied narrowly to the facts of this case, we interpret the agreed-upon proceeding encompassed both an opportunity to be heard by the Board and a right to seek review from the Church Leaders. Because the right to seek binding review by the Church Leaders was the illusory product of a mutual mistake, the April 2014 "arbitration proceeding" could never be completed, and Patrick cannot have waived his objection thereto.

¶33    Moreover, even if Patrick had waived his right to object to the purported April 2014 arbitration hearing, any award derived from that arbitration would be unenforceable against the Siblings, who did not agree to arbitrate and cannot be bound to the outcome.[9] *See supra* Part I.

> The test of indispensability in Arizona is whether the absent person's interest in the controversy is such that no final judgment or decree could be entered, doing justice between the parties actually before the court and without injuriously affecting the rights of others not brought into the action.

*Copper Hills Enters. v. Ariz. Dep't of Revenue*, 214 Ariz. 386, 392, ¶ 21 (App. 2007) (quoting *Town of Gila Bend v. Walled Lake Door Co.*, 107 Ariz. 545, 549 (1971)). Indispensability of parties is a question of law subject to *de novo* review. *Gerow*, 192 Ariz. at 14, ¶ 19 (citing *Connolly v. Great Basin Ins.*, 6 Ariz. App. 280, 285 (1967), and *Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 114 (1966)).

¶34    Applying this principle to the facts before us, we conclude there is no way the Board could address the valuation of the vacation homes

---

[9]    Although the indispensability defense was not addressed by the trial court, it is not waivable and may be raised at any time. *Gerow v. Covill*, 192 Ariz. 9, 14,    ¶ 19 (App. 1998) (citing *City of Flagstaff v. Babbitt*, 8 Ariz. App. 123, 127 (1968)).

and apportion the proper percentage interest among the Cardon family members without affecting the rights of the Siblings as trust beneficiaries with ownership interests in those homes.[10] The Siblings are therefore indispensable to a just determination of the action. Without their participation, arbitration of this issue under the Management Agreement is a meaningless nullity.

¶35 Accordingly, we find no error in the trial court's order declining to compel Patrick to arbitrate the dispute before the Board.

### III. Appellants Waived Their Opportunity to Request an Evidentiary Hearing.

¶36 Appellants contend the trial court's determination that certain questions of fact remained regarding whether the Appellees ratified and accepted the Management Agreement or the Board's decisions, generally, requires this Court to remand the matter for an evidentiary hearing. Appellants have not shown how the factual disputes on these issues are relevant to the sole question before the trial court — whether Appellees could be compelled to participate in arbitration. But we need not reach that issue because the record reflects Appellants waived their opportunity to contest the court's decision not to hold an evidentiary hearing.

¶37 Pursuant to A.R.S. § 12-3007(A)(2):

---

[10] The Appellants argue the Siblings' claims are derivative of the Companies' because Wil, as the manager of the Companies, consented to the Board's arbitration authority under the Management Agreement. However, conferring arbitration authority on the Board was not a mere business transaction requiring only management authority. The terms of the Management Agreement itself recognized this, as the Agreement provided signature lines for the Siblings in their various capacities and included a provision calling for the Companies' governing documents to be revised to bestow authority on the Board. *See supra* ¶ 7. None of the parties allege that revision occurred. Moreover, a grant of such broad authority, as defined in the Management Agreement, would materially and adversely affect the Siblings' rights under the Companies' governing documents. As members of the entity that manages the "main economic vehicle" of the Cardon Companies, the Siblings never voted or consented to amend any operating agreements to allow for such a material and adverse effect on their rights.

> On motion of a person showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to the agreement . . . the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate.

To proceed "summarily," the trial court must first determine whether material issues of fact are disputed and, if so, conduct an expedited evidentiary hearing to resolve those disputes. *Ruesga*, 215 Ariz. at 596, ¶ 24 (quoting *Haynes v. Kuder*, 491 A.2d 1286, 1290 (D.C. 1991)). The party claiming the existence of a factual dispute regarding arbitrability bears the burden of requesting a hearing. *Id.* (citing *Ex parte Greenstreet, Inc.*, 806 So.2d 1203, 1207 (Ala. 2001)). Absent a request, "any error in the trial court's not holding an evidentiary hearing is waived" on appeal. *Brake Masters Sys., Inc. v. Gabbay*, 206 Ariz. 360, 365, ¶ 15 (App. 2003) (citing *Hahn v. Pima Cty.*, 200 Ariz. 167, 172, ¶ 13 (App. 2001), and *Trustmark Ins. v. Bank One, Ariz., NA*, 202 Ariz. 535, 543, ¶ 38 (App. 2002)).

¶38 The record reflects Appellants made only a passing reference to holding an evidentiary hearing in their motions for a new trial and to amend the order denying the motion to compel arbitration as to the Siblings. And the evidence Appellants asserted as creating a genuine issue of material fact was almost wholly contained in Beus' affidavit, which the trial court explicitly reviewed, referenced, and apparently rejected in its order denying Appellants' motion to compel the Siblings to arbitration. Furthermore, the record reflects the court heard oral argument and reviewed hundreds of pages of the parties' pleadings and supporting documentation and gave the matter adequate consideration after taking it under advisement. When the court deferred its decision on Patrick's obligation to participate in arbitration to a later date, Appellants were granted a second opportunity to provide additional briefing and exhibits and participate in oral argument. At no time did they request an evidentiary hearing.

¶39 With regard to the Siblings, Appellants' obscure reference to an evidentiary hearing was both untimely — occurring for the first time in motions filed after the trial court ruled on the motion to compel the Siblings to arbitration, *see Brake Masters*, 206 Ariz. at 365, ¶ 15 — and superfluous, without reference to additional or previously undiscovered, relevant evidence not already contained in the robust record upon which the court based its ruling. With regard to Patrick, Appellants did not request a hearing at all. On this record, Appellants waived any claims of error regarding the failure to hold an evidentiary hearing.

**CONCLUSION**

**¶40**         The trial court's denial of Appellants' motion to compel arbitration is affirmed as to all Appellees.

**¶41**         Both parties request an award of attorneys' fees on appeal. Appellants cite A.R.S. § 12-3014(E) as the authority for their request. This section authorizes an award of fees to an arbitrator who is determined to be immune from civil liability. Because we hold the parties did not have an enforceable arbitration agreement, this section does not apply, and Appellants request is denied. Appellees request attorneys' fees pursuant to A.R.S. § 12-341.01(A). In our discretion, we deny Appellees' request. However, as the successful parties, Appellees are awarded their costs on appeal pursuant to A.R.S. § 12-341 and upon compliance with ARCAP 21(b).



AMY M. WOOD • Clerk of the Court
FILED:  AA