NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

DMS COMPANIES, INC., *Plaintiff/Appellee*,

*v.*

CHRISTOPHER A. HERNANDEZ, et al., *Defendants/Appellants*.

No. 1 CA-CV 23-0028
FILED 10-12-2023

Appeal from the Superior Court in Maricopa County
No. CV2022-052534
The Honorable Timothy J. Thomason, Judge

**AFFIRMED**

COUNSEL

Titus Brueckner Spitler & Shelts PLC, Scottsdale
By David A. Fitzgerald
*Counsel for Plaintiff/Appellee*

Quarles & Brady LLP, Phoenix
By Jimmie W. Pursell, Jr., David J.F. Peabody
*Counsel for Defendants/Appellants*

---

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge David D. Weinzweig and Judge Michael S. Catlett joined.

---

**C R U Z**, Judge:

¶1             Christopher A. Hernandez, Michelle Hernandez, Denise Hernandez, HC Companies, Inc., and CD Enterprises, LLC (collectively "Hernandez") appeal from the superior court's order denying their motion to compel arbitration.  For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2             In 2021, Hernandez agreed to sell to DMS Companies, Inc. ("DMS") substantially all of their construction, project management, facilities maintenance, and general contracting business for $3,800,000, subject to a purchase price adjustment to be made under the parties' Asset Purchase Agreement ("APA").  The parties also entered into a Transition Services Agreement ("TSA"), under which Hernandez would provide services to DMS to assist in the transfer of the business.

¶3             Section 1.02 of the APA, entitled "Accounting Terms," provided that all accounting terms and determinations, and all financial statements and calculations, would be prepared in accordance with generally accepted accounting principles ("GAAP").

¶4             Section 2.06 of the APA, entitled "Purchase Price Adjustment," provided:

> If the parties are unable to come to agreement on the Working Capital[1] on or before the period ending at 11:59 p.m. local time

---

[1]      The APA defined "Working Capital" as "an amount equal to, without duplication, the sum of Accounts Receivable, Inventory, prepaid expenses, vendor rebates receivable, retentions and holdbacks and other current assets (but excluding any tax receivables, tax refunds and other tax assets (including any deferred tax assets) and cash, except to the extent transferred to Buyer) of the Company as of a specified date, less the combined accounts payable, accrued expenses, and other current Liabilities

on Thursday, January 20, 2022, then each of Seller's Principals and Buyer shall submit on or before Monday, January 24th at 11:59 p.m., local time, or such other time as directed to the parties by the Third Party Auditor (as defined below) a Working Capital statement they reasonably believe to be true and correct with supporting detail to Grant Thornton (the **"Third Party Auditor"**) for review.

. . . .

On or before the end of the Third Party Auditor Review Period, the Third Party Auditor shall determine the prevailing Working Capital statements. Fifty percent (50%) of the fees charged by the Third Party Auditor shall be paid by Buyer and the other fifty percent (50%) shall be paid by Seller's Principal[s]. The **"Finalized Working Capital Statement"** shall mean (i) the prevailing Working Capital statement determined by the Third Party Auditor; (ii) the Initial Working Capital Statement if not objected to by Buyer prior to expiration of the Working Capital Review Period; or, if objections are made by Buyer during the Working Capital Review Period and the parties are able to resolve the objections in a manner acceptable to Buyer within the applicable review period, then (iii) the Working Capital statement agreed upon by Buyer and Seller's Principals.

**¶5** Section 7.10 of the APA limited the available remedies for a breach of the APA to indemnity provisions but excluded section 2.06 and certain tort and equitable claims from its limitations. Section 8.10(b) of the APA, a forum selection clause, provided that any legal action arising out of the APA or TSA would be brought in "federal or state courts" in Maricopa County.

**¶6** Escrow for the sale of the business closed in August 2021. After closing, Hernandez submitted two Initial Capital Working Statements, both of which DMS objected to on the basis that they had not been prepared in accordance with GAAP. After the parties were unable to agree on the working capital number, they were unable to come to an

---

of the Company not to be repaid as of the Closing (excluding any deferred tax liability established to reflect timing differences between book and tax income, any amounts owing with respect to any borrowed monies). Working Capital shall be calculated in accordance with GAAP."

agreement with "Third Party Auditor" Grant Thornton to engage its services.

**¶7**　　　　In late 2022, DMS filed a complaint and amended complaint in superior court against Hernandez raising claims of breach of the APA and TSA, breach of the covenant of good faith and fair dealing, unjust enrichment, misrepresentation, negligent misrepresentation, negligence, violation of Arizona's consumer fraud statutes, indemnity, and set off. Among other things, DMS alleged Hernandez failed to provide it with software, a $90k deposit, and books and records, failed to pay liabilities it was obligated to pay including employee salaries and benefits, failed to terminate employees, and failed to disclose liabilities it was required to disclose, including substantial accounts payable. In addition, DMS alleged Hernandez altered accounting records, failed to prepare its Initial Capital Working Statements in accordance with GAAP, did not make reasonable efforts to work with DMS to resolve the working capital dispute, failed to provide an adequate reserve for bad debt, and conveyed equipment and vehicles to it that were in disrepair or had expired registration.

**¶8**　　　　Hernandez did not file an answer or counterclaims. Instead, it moved to compel arbitration of two of DMS' claims pursuant to Arizona Revised Statutes ("A.R.S.") section 12-3007(A) and stay all of the proceedings. DMS opposed the motion, and, after oral argument, the superior court denied it.

**¶9**　　　　Hernandez timely appealed. We have jurisdiction pursuant to A.R.S. § 12-2101.01(A)(1).

**DISCUSSION**

**¶10**　　　　It is undisputed that the APA did not contain a general provision to arbitrate. However, Hernandez argues the superior court erred by denying the motion to compel arbitration because section 2.06 was an arbitration provision.

**¶11**　　　　"The trial court's review on a motion to compel arbitration is limited to the determination as to whether an arbitration agreement exists." *Est. of Decamacho ex rel. Guthrie v. La Solana Care & Rehab, Inc.*, 234 Ariz. 18, 20, ¶ 8 (App. 2014) (citation and internal quotation marks omitted). *See also* A.R.S. § 12-3006(B) (superior court "shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."); A.R.S. § 12-3007(C) ("If the court finds that there is no enforceable agreement, it may not order the parties to arbitrate . . . ."). "We must defer, absent clear error, to the factual findings upon which the trial court's

4

conclusions are based." *Decamacho*, 234 Ariz. at 20, ¶ 8 (citation and internal quotation marks omitted). "To the extent the issues require us to consider and interpret legal principles and statutes, our review is de novo." *Id.* (citation and internal quotation marks omitted).

**¶12** Arizona law deems valid any "agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement . . . ." A.R.S. § 12-3006(A). The terms "agreement to arbitrate" and "arbitration" are not defined by Arizona's Revised Uniform Arbitration Act ("RUAA"). *See* A.R.S §§ 12-3001 to -3029. However, in Arizona, "'[a]rbitrator' means an individual who is appointed to render an award, alone or with others, in a controversy that is subject to an agreement to arbitrate." A.R.S. § 12-3001(2).

**¶13** Public policy favors arbitration as the preferred means of dispute resolution. *Stevens/Leinweber/Sullens, Inc. v. Holm Dev. & Mgmt., Inc.*, 165 Ariz. 25, 29 (App. 1990). "However, that same public policy presupposes the existence of a valid agreement to arbitrate." *Id.* at 30. "Although it is commonly said that the law favors arbitration, it is more accurate to say that the law favors arbitration of disputes that the parties have agreed to arbitrate." *S. Cal. Edison Co. v. Peabody W. Coal Co.*, 194 Ariz. 47, 51, ¶ 11 (1999). "In general, a party is bound to arbitrate only those disputes which it has contractually agreed to arbitrate, and is not bound to arbitrate disputes it has not specifically agreed to arbitrate." *Dueñas v. Life Care Ctrs. of Am., Inc.*, 236 Ariz. 130, 139, ¶ 26 (App. 2014) (citations and internal quotation marks omitted). *See also Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010) ("Arbitration is strictly a matter of consent, and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.") (citations and internal quotation marks omitted).

**¶14** When interpreting a contract, the superior court must "attempt to ascertain and give effect to the intention of the parties at the time the contract was made if at all possible." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 153 (1993) (citation and internal quotation marks omitted). "[A] contract must be construed as a whole, and each and every part must be read in the light of the other parts." *Goodman v. Newzona Inv. Co.*, 101 Ariz. 470, 473 (1966) (citation omitted).

**¶15** Noting that DMS had argued it was not pursuing any claim necessitating a determination of working capital under Section 2.06, the superior court first concluded it had no authority to order the parties to arbitrate the working capital issue for that reason.

¶16 Next, the superior court concluded that section 2.06 did not contain an agreement to arbitrate. The court reasoned that, although it may not be necessary for the parties to use the word "arbitration" for an arbitration agreement to exist,

> there are words that should have been used to make it clear that the parties were agreeing to a mandatory dispute resolution proceeding that would be binding in court. No such words were used. In fact, the [APA] is not clear as to whether the decision of the Third Party Auditor would be binding in subsequent litigation.
>
> The Third Party Auditor provisions can certainly be reasonably understood to be a mechanism to assist parties to complete the transaction. Contracts often contain provisions discussing the retention of experts to help resolve issues, which may not be intended to be binding in litigation.
>
> . . . .
>
> [T]he Court does not find Section 2.06 to be an agreement to arbitrate. That provision provides a mechanism for the parties to resolve disagreements about working capital. If the parties intended for that section to constitute an agreement to arbitrate, they should have simply referred to the process as an arbitration or used some language that could be reasonably construed as an arbitration agreement. They did not do so.

¶17 Even if the amended complaint placed section 2.06 in dispute, as Hernandez argues, section 2.06 did not require arbitration. In section 2.06 of the APA, the parties referred to accountant Grant Thornton as a "Third Party Auditor" rather than an "arbitrator," "judge," or "sole adjudicator," and referred to the work to be performed by Grant Thornton as a "review"[2] rather than an "arbitration," "adjudication," or "dispute resolution." Nor does section 2.06 refer to an "award." *See Penton Bus.*

---

[2] A "review" is a form of attest service performed by a certified public accountant. *See* A.R.S. § 32-701(3)(b) (attest services include "[r]eviews of financial statements to be performed in accordance with the statements on standards for accounting and review services adopted by the American institute of certified public accountants.").

*Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 458 (Del. Ch. 2018) ("An expert determination—whether by an appraiser, an auditor, or a different type of expert—is not an arbitration unless the parties specifically designate that expert as an arbitrator for that purpose, thereby invoking the body of law governing arbitrators.") (citation and internal quotation marks omitted); *Sapp v. Indus. Action Svcs. LLC*, 75 F.4th 205, 212 (3d Cir. 2023) (when parties' purchase agreement contained an agreement to submit narrow disputes to an accounting firm, they agreed to an expert determination, not arbitration).

**¶18** Hernandez argues section 2.06 should be construed as an arbitration provision because the parties used the word "final" as a substitute for "binding." Although section 2.06 repeatedly refers to Grant Thornton's anticipated "Finalized Working Capital Statement," and once refers to a "final, agreed-upon statement," use of such language does not evidence an agreement that Grant Thornton serve as an arbitrator or permit the superior court to order the parties to arbitrate under RUAA. Although we agree the words "arbitration" or "arbitrate" need not necessarily be used, the language of this contract shows that the parties designated Grant Thornton as an expert accounting firm for the limited purpose of resolving factual disputes about working capital and the purchase price adjustment by applying accounting principles. Our holding that there was no agreement to arbitrate does not render section 2.06 superfluous. Section 2.06 is still an enforceable contractual provision. If DMS remains in violation of section 2.06, Hernandez may bring an action for specific performance in the superior court. The superior court did not err by denying Hernandez' motion to compel arbitration.

**¶19** Hernandez requests an award of attorneys' fees pursuant to A.R.S. § 12-341.01, under which we may award reasonable fees to the successful party in an action arising out of contract. We deny the request. *See Austin v. Austin*, 237 Ariz. 201, 210-11, ¶ 34 (App. 2015) (when appeal involved superior court's ruling denying motion to compel arbitration no decision on the merits had been made so parties' requests for attorneys' fees pursuant to A.R.S. § 12-341.01 were denied).

**CONCLUSION**

¶20        For the foregoing reasons, we affirm.

